MORRISON GRAIN COMPANY, INC., a corporation, Plaintiff–Appellee,

v.

UTICA MUTUAL INSURANCE COMPANY, a corporation, Defendant–Appellant.

No. 78–2163.

United States Court of Appeals, Fifth Circuit.

Dec. 8, 1980.

---

Jack C. Rinard, Tampa, Fla., Bigham, Englar, Jones & Houston, Joseph J. Magrath, III, New York City, for defendant–appellant.

David G. Hanlon, Tampa, Fla., for plaintiff–appellee.

Before TUTTLE, BROWN and TATE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This lawsuit arose out of an insurance company's refusal to pay an insurance claim

for loss of and damage to a cargo of bagged urea being shipped from Romania to Mississippi. Although the subject matter of this action would undoubtedly not be considered too glamorous by most laymen, the matter is of obvious consequence to the parties involved and raises significant legal questions as well. The principal legal question involved in this case concerns the respective burdens of proof under a marine insurance policy insuring against "all risks of physical loss or damage to property from any external cause." Utica Mutual Insurance Co., Insurer, contends that the District Court, 446 F.Supp. 415, improperly allocated the burden of proof with respect to the insurance claim and then confounded matters further by making an erroneous fact finding under the improper legal standard. Insurer further contends that the District Court made multiple errors in its damages award to the Insured, Morrison Grain Company (Morrison). Finally, Insurer argues that the Court improperly granted attorneys' fees to Morrison. Because we find that the Court properly allocated the burden of proof, the fact findings of the Court were not clearly erroneous, the attorneys' fees award to Morrison was proper, but that certain of Insurer's contentions with respect to damages have merit, we affirm in part and remand in part.

### Urea and Water Do Mix

Our saga begins on October 26, 1973 when Kearney Chemicals, Inc. (Kearney), a Delaware corporation with its corporate headquarters in Florida, contracted to sell a quantity of bagged urea to Morrison, a Kansas corporation with its principal place of business in Kansas. The urea was to be shipped from Constantza, Romania to Gulfport, Mississippi. Prior to delivery, various terms were amended as to price, quantity and packaging. Ultimately, Morrison agreed to purchase a shipload cargo of 5,500 net metric tons [1] of urea packaged in 50 kilo polyethylene bags on C.I.F. Gulfport terms.[2]

Prior to its contract with Morrison, Kearney had executed a binder on an open cargo insurance policy with Insurer, a New York Corporation with its principal office in New York.[3] The policy provided for coverage against "All risks of physical loss or damage from any external cause whatsoever ...". In accordance with its agreement with Morrison, on March 20, 1974, Kearney obtained a special marine policy from Insurer covering the shipment of urea. The special marine policy was subject to the "all risks" coverage provision of the open cargo policy and any loss under the policy was payable to the assured or order. The policy was delivered to Kearney at its corporate headquarters in Tampa, Florida and was subsequently assigned by Kearney to Morrison.

Kearney bought the urea to be supplied to Morrison from International Affiliates, Inc., which in turn had purchased the urea from Azoexport Bucharest, Romania. Azoexport packaged the urea into polyethylene bags. To transport the cargo, International Affiliates, Inc., chartered the M/V AIDA which proceeded to load at Constantza. A clean on-board bill of lading was signed for 110,000 bags of urea and the AIDA set sail from Constantza on March 6, 1974, arriving in Gulfport on April 9, 1974.

1. A "metric ton" equals approximately 2,205 pounds. A "short ton" equals 2,000 pounds.

2. According to the Uniform Commercial Code, C.I.F. means that the seller (Kearney) is to provide insurance to cover the shipment of cargo. The C.I.F. price includes cost of the goods, insurance and freight to the named destination (Gulfport). U.C.C. § 2–320.

3. The binder on the open cargo policy was in fact executed by Kearney International, a corporation with the same president, the same chairman of the board, and the same corporate address as Kearney Chemicals. (For purposes of simplification, both Kearney International and Kearney Chemicals are referred to as "Kearney"). The policy was obtained by Kearney through Fairfield & Ellis, an independent insurance broker. Fairfield & Ellis developed the insurance package using a form of Mutual Marine Office, the underwriter for Utica, and Mutual Marine executed the binder. Although the open cargo policy was dated April 24, 1974, by its own terms it was effective as of the date of the execution of the binder–September 21, 1973.

The AIDA was discharged by Ryan–Walsh Stevedoring Company. Upon discharge it was discovered that many of the bags were ruptured, distorted and damaged. Additionally, there was loose, caked and partially dissolved urea on bags in several holds. Additional damage occurred during the discharge operation due to the hydroscopic nature of the loose urea which caused the bags to be wet and slippery and therefore difficult to handle. A large quantity of urea in the number four lower hold, starboard side had simply dissolved and melted away.

After discharge, Insurer declined the insurance claim for damage to and shortage of the urea and a flurry of claims and cross–claims ensued. Morrison initiated this action against Insurer for recovery under the insurance contract and against Kearney for breach of the sales contract. Kearney then tendered the defense of the Morrison suit to Insurer and upon Insurer's refusal to accept tender cross–claimed against Insurer for attorney's fees for its defense costs. Finally, Insurer cross–claimed against Kearney alleging that Kearney had misrepresented the quality of the bags to be shipped, thus voiding coverage of the insurance contract.

The matter was tried to the judge without a jury. The court ruled against Insurer on its misrepresentation cross–claim against Kearney and Insurer does not challenge that portion of the court's decision on appeal. The court, 446 F.Supp. 415, held that Kearney was not liable to Morrison under its sale contract but that Insurer was liable to Morrison under the insurance contract for a total amount of $165,485.36. The court further held that Insurer was liable to Morrison for attorneys fees totaling $27,-450.00. Finally, the court held that Insurer was liable to Kearney for attorney's fees incurred in defense of the Morrison suit. This final matter has been resolved by the parties, and Kearney, therefore, is no longer a party to this appeal.

Although the complex issues presented by this case have been somewhat narrowed on appeal, there still remain a number of serious contentions to be reviewed by this court. Specifically, Insurer contends that the Court improperly construed the law with respect to the allocation of the burden of proof under an "all risk" insurance contract of the type involved in this case. Insurer further maintains that the Court made an erroneous fact–finding in determining that the damage to the bags of urea arose from improper stowage rather than from inherent defect in the bags. Insurer next contends that certain findings of the District Court with respect to damages arising from the loss of urea were erroneous. Finally, Insurer maintains that the Court was in error in granting attorneys' fees to Morrison.

### Whose Law?

█ Before reaching the substantive questions raised by Insurer on its appeal, we must first determine which law is to govern the interpretation of the marine insurance policy involved in this case–federal maritime law,[4] New York law,[5] or Florida law.[6] This choice of law question apparently troubled neither the parties nor the trial court as we find no reference to this issue in either the briefs or the opinion below. Nevertheless, we deem the question to be of sufficient importance to at least address, though we need not be stranded long on this legal shoal.

4. It is well settled that a marine insurance policy is a maritime contract within federal admiralty jurisdiction. *Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S.Ct. 886, 889, 6 L.Ed.2d 56, 1961 AMC 833 (1961); *Insurance Co. v. Dunham*, 78 U.S. (11 Wall.) 1, 33–34, 20 L.Ed. 90 (1870); *Irwin v. Eagle Star Insurance Co.*, 455 F.2d 827, 829, 1973 AMC 1184 (5th Cir.), *cert. denied*, 409 U.S. 852, 93 S.Ct. 118, 34 L.Ed.2d 95 (1972).

5. The insurance policy was drawn up in New York.

6. The insurance policy was delivered in Florida to a corporation with its corporate headquarters in Florida.

■ With respect to this choice of law issue, we are directly confronted with *Wilburn Boat Company v. Firemen's Fund Insurance Company*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337, 1955 AMC 467 (1955), and the case law left in *Wilburn Boat's* somewhat choppy wake.[7] We do not find *Wilburn Boat* to present a significant obstacle to the application of maritime law in this case, however, as we find the law of neither New York nor Florida to be materially different from maritime law.[8] We find further support for our decision to apply maritime law in the fact that neither New York nor Florida appears to have such a substantial and legitimate interest in this case as to compel the application of state law.[9]

### The Shifting Burden

We turn now to Insurer's first of many points of error,[10] that the Court improperly allocated the burden of proof with respect to Morrison's claim under the insurance policy. The Court concluded that under an "all risk" insurance policy "the insured [has the initial burden of proving] that the cargo was in good condition when the policy attached and that the cargo was damaged when unloaded from the vessel."[11] The burden then shifts to the insurer to show exception to coverage.[12]

Insurer argues that the District Court opinion correctly states the law with respect to those cases in which the insurer asserts affirmative defenses based upon policy exclusions, but that such law has no bearing on this case. Insurer claims that its defense is based not upon an exception to coverage, but rather on Morrison's failure to bring itself within the affirmative insuring language of the policy which protects "against all risks of physical loss or damage to the property insured from any external cause." In this regard, Insurer argues that Morrison should have had the burden of showing that (i) the loss or damage to the urea was occasioned by an external cause, (ii) the loss or damage to the urea was fortuitous, and (iii) the event producing the loss or damage to the urea occurred while the policy was in force. We find these contentions unpersuasive.

(i)

■ Insurer argues first that Morrison should have had the burden of bringing itself within the express coverage of the insurance policy by showing that the loss of or damage to the urea was occasioned by an external cause. It is true that the burden of proof generally is upon the insured to show that a loss arose from a covered peril. *S. Felicone & Sons Fish Co. v. Citizens Casualty Co. of N.Y.*, 430 F.2d 136 (5th Cir. 1970), *cert. denied*, 401 U.S. 939, 91 S.Ct. 936, 28 L.Ed.2d 219 (1971); *Northwestern Mutual Life Ins. Co. v. Linard*, 498 F.2d 556 (2nd Cir. 1974). However, as a reviewing

---

7. This Circuit is well acquainted with the *Wilburn Boat* case. See,
    *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 5 Cir., 1953, 201 F.2d 833, reversed, 1955, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337, on remand, 5 Cir., 1958, 259 F.2d 662, cert. denied, 1959, 359 U.S. 925, 79 S.Ct. 607, 3 L.Ed.2d 628, and concluding with 5 Cir., 1962, 300 F.2d 631, 1962 A.M.C. 1593, cert. denied, 1962, 370 U.S. 925, 82 S.Ct. 1562, 8 L.Ed.2d 505.

8. See, *Walker & Sons, Inc. v. Valentine*, 431 F.2d 1235, 1239, 1970 AMC 2261 (5th Cir. 1970); *Gulfstream Cargo, Ltd. v. Reliance Insurance Company*, 409 F.2d 974, 980–81, 1969 AMC 781 (5th Cir. 1969).

9. See, *Walter v. Marine Office of America*, 537 F.2d 89, 94–95, 1977 AMC 1471 (5th Cir. 1976); *Irwin*, 455 F.2d at 829–30.

10. As we launch into an analysis of the complex legal issues and fact questions involved in this case, we are reminded of the words of Justice Bradley written over a century ago but still true today: "[T]he contract of marine insurance is an exotic in the common law." *Insurance Co. v. Dunham*, 78 U.S. (11 Wall.) 1, 32, 20 L.Ed. 90 (1870).

11. *Morrison Grain Co., Inc. v. Utica Mut. Ins. Co.*, 446 F.Supp. 415, 420, —— AMC —— (M.D. Fla.1977), quoting *Welded Tube Co. v. Hartford Fire Insurance Co.*, 1973 AMC 555 (E.D.Pa. 1972).

12. 446 F.Supp. at 422.

Court we must view each contract in the light of the setting of the parties and their reasonable expectations as to risks and protection against them,[13] and an insurance policy in such a way as to effectuate its purpose.[14]

■ The District Court correctly construed the policy here as an "all risks" policy. See, *Atlantic Lines Limited v. American Motorists Insurance Company*, 547 F.2d 11 (2nd Cir. 1976). As has been recognized in other circuits, "it would appear that all risks insurance arose for the very purpose of protecting the insured in those cases where difficulties of logical explanation or some mystery surround the [loss of or damage to] property."[15] It would seem to be inconsistent with the broad protective purposes of "all risks" insurance to impose on the insured, as Insurer would have us do, the burden of proving the precise cause of the loss or damage.[16] It is not surprising, therefore, that courts which have considered claims under insurance policies with essentially the same insuring language as the policy before us have consistently refused to require the insured to demonstrate that the loss or damage was occasioned by an external cause.[17] We similarly refuse to impose such a burden in this case.

(ii)

Insurer mounts an additional attack on the Court's allocation of the burden of proof charging that the Court failed to impose on Morrison the burden of showing that the loss of and damage to the urea was fortuitous. There is certainly a substantial body of authority which suggests that in an action under an "all risks" policy the insured must sustain such a burden.[18] We are not troubled by this authority, however, as the Court could, and impliedly did, find with adequate support that there was no indication that the urea met its unfortunate end through anything but fortuitous circumstances.

The burden of demonstrating fortuity is not a particularly onerous one. The Restatement of Contracts § 291, comment a

**13.** See, *Walter*, 537 F.2d at 95; *Motor Vehicle Cas. Co. v. Atlantic Nat'l. Ins. Co.*, 374 F.2d 601 (5th Cir. 1967); *Am. Agricultural Chem. Co. v. Tampa Armature Works, Inc. & Am. Agricultural Chem. Co. v. Nye*, 315 F.2d 856 (5th Cir. 1963) (Brown, C. J., concurring); *Indem. Ins. Co. of N. Am. v. DuPont*, 292 F.2d 569 (5th Cir. 1961); *U. S. Indus., Inc. v. Camco, Inc.*, 277 F.2d 292 (5th Cir. 1960); *Fidelity–Phenix Fire Ins. Co. v. Farm Air. Serv., Inc.*, 255 F.2d 658 (5th Cir. 1958); *Am. Fidelity & Cas. Co. v. St. Paul–Mercury Indem. Co.*, 248 F.2d 509 (5th Cir. 1957).

**14.** See, *Walter*, 537 F.2d at 95; 13 Appleman, Insurance Law and Practice (1943) at § 7386.

**15.** See, *Atlantic Lines*, 547 F.2d at 13; *Betty v. Liverpool and London and Globe Insurance Co.*, 310 F.2d 308, 311 (4th Cir. 1962). Although these cases concerned the disappearance of property, we believe that their observation concerning the purpose of "all risks" insurance is equally applicable to cases involving damage to property.

**16.** This Circuit has already held that in a claim under an "all risks" policy, the insured is not required to negative each of the policy exceptions in order to recover:

[4] There was a loss, and it was established by positive evidence. The assured did not have to go further to demonstrate that such loss was *not* caused by one of the excepted conditions. To escape the broad undertaking of this comprehensive cover, the insurer had the burden of establishing that. *Jewelers Mutual Insurance Co. v. Balogh*, 272 F.2d 889, 892 (5th Cir. 1959).

**17.** See, *Atlantic Lines*, 547 F.2d at 12; *Redna Marine Corp. v. Poland*, 46 F.R.D. 81, 1969 AMC 1809 (S.D.N.Y. 1969). See also, *Northwestern Mutual*, 498 F.2d at 561, n.5:

this was not a so–called 'all risks' policy wherein all losses attributable to external causes are covered, absent specific exclusion thereof. [cites omitted] In an 'all risks' policy the burden is plainly on the underwriter to show that an exception to coverage applies. But see, *Monarch Industrial Corp. v. American Motorist Insurance Co.*, 1967 AMC 2488 (S.D. N.Y. 1967).

**18.** See, *Texas Eastern Transmission v. Marine–Office, Etc.*, 579 F.2d 561, 564 (10th Cir. 1978):

The general rule ... is that the burden is upon the insured to prove that a loss occurred *and that it was due to some fortuitous event or circumstance.* (emphasis added) See also, *Atlantic Lines*, 547 F.2d at 12; *Northwestern Mutual*, 498 F.2d at 561, n.5; *British & Foreign Marine Inc. Co. v. Gaunt* [1921] A.C. 41, 46–47; *Redna*, 46 F.R.D. at 87.

(1932)[19] defines a fortuitous event as follows:

> A fortuitous event . . . is an event which so far as the parties to the contract are aware, is dependent on chance. It may be beyond the power of any human being to bring the event to pass; it may be within the control of third persons; it may even be a past event, as the loss of a vessel, provided that the fact is unknown to the parties.

In this regard, courts which have considered the question have rejected the notion that the insured must show the precise cause of loss to demonstrate fortuity.[20] Furthermore, courts have held that a loss may be fortuitous even it if is occasioned by the negligence of the insured.[21]

■ Under either of the two theories as to the cause of damage to the urea in this case—improper stowage as the District Court held or inherent defect in the bags as Insurer contends—the damage was clearly fortuitous. Insurer does not seriously contend that either Morrison or Kearney, its assignor of the insurance policy, was aware, before the fact, that the events producing loss were dependent on anything other than chance.[22] Although the Court may have failed in its opinion to expressly place on Morrison the burden of showing a fortuitous loss, we decline at this point to mechanically erect barriers to recovery where the law and facts in no way compel us to do so.

### (iii)

■ Finally, Insurer argues that the burden was on Morrison of proving that the event producing the loss of property occurred while the insurance policy was in force. While it is true that an insurer is ordinarily not liable for inherent vices or defects of goods existing prior to the time of coverage, *Greene v. Cheetham*, 293 F.2d 933 (2nd Cir. 1961), we deem this to be an exception to coverage the burden of proving which properly lies with the insurer under an "all risks" policy.[23]

By way of summary to this point, we conclude that the District Court properly allocated the respective burdens of proof. Morrison, the insured, had the initial burden of proving a loss by showing that the cargo of urea was in good condition when the policy attached and in damaged condition when unloaded from the vessel. The burden then shifted to Insurer, to show exception to coverage.

### *Were the Burdens Carried?*

Unfortunately, concluding that the District Court properly allocated the burdens of proof in this case does not conclude our inquiry. We must now review that Court's findings of fact to determine whether the parties sustained their respective burdens.

At the outset, it seems appropriate to make the observation that Insurer in its briefs, "[could] not resist the natural temptation to reargue the facts from a point of view favorable to [it], although now adversely determined by the trial Judge." *Grigsby v. Coastal Marine Service of Texas, Inc.*, 412 F.2d 1011, 1020 (5th Cir. 1969); *Myles v. Quinn Menhaden Fisheries, Inc.*, 302 F.2d 146, 148, 1962 AMC 1626, 1628 (5th Cir. 1962). In reviewing the facts, however, we must be mindful of the restraints placed on our reviewing authority. It is well established that the "clearly erroneous" standard of review is "now incrusted on the hull of maritime jurisprudence." *Grigsby*, 412 F.2d at 1020; *Compania Anonima Venezolana de Navegacion v. A. J. Perez Export Co.*, 303 F.2d 692, 694, 1962 AMC 1710, 1712 (5th Cir. 1962); F.R.Civ.P. 9(h). We further must take heed that:

> *Fireman's Fund Ins. Co.*, 372 F.2d 784, 789 (9th Cir. 1967).

**19.** Quoted with approval in *Texas Eastern Transmission*, 579 F.2d at 564.

**20.** *Texas Eastern Transmission*, 579 F.2d at 564; *Atlantic Lines*, 547 F.2d at 12.

**21.** *Redna*, 46 F.R.D. at 87. See also, *Federal Ins. Co. v. Tamiami Trail Tours, Inc.*, 117 F.2d 794, 796 (5th Cir. 1941); *C. H. Leavell & Co. v.*

**22.** Insurer has abandoned its claim that Kearney misrepresented the quality of the bags.

**23.** See discussion in part (i) *supra*.

In this kind of controversy the functions of the courts in the judicial hierarchy are distinct and different and we would undermine the vitality of the system by a too–quick meddling in the principal business of a trial court. A trial of a hotly contested, sharply disputed case is the task of a trial court and reviewing courts even in admiralty should be slow to overturn fact decisions made by the judge before whom the facts are annealed through the hammering, heating process of vigorous running advocacy. [citation omitted] Indeed, we must constantly remind ourselves of our distinctive roles. If we were to approach it as simply a question–how should this case be decided?–we would effectually bypass a trial court. The problem faced is more nearly that of determining whether the trial judge, faced with the choice–often hard choices between competing versions of simple or complex occurrences–has fairly weighed the matter and has reached a conclusion which seems substantial and reasonable even though another result might have been achieved either by him or others.

*Grigsby*, 412 F.2d at 1020.

### Good Order and Condition? (Morrison's Burden)

We consider first Morrison's burden of proof. As outlined previously, under the circumstances of this case Morrison had the burden of showing that the cargo was in good order and condition when the policy attached, and that the cargo was damaged when unloaded from the vessel. The District Court concluded that Morrison had sustained this burden. 446 F.Supp. at 421.

No one seriously questions that much of the urea was seriously damaged at the time it was unloaded from the vessel. Insurer asserts, however, that Morrison failed to show that the condition of the cargo when it arrived in Gulfport, except that in the number four hold, was any worse than when it was shipped.

As evidence of the good order and condition of the cargo at the time of loading Morrison offered at trial, without objection, the clean on–board bill of lading issued in Constantza covering "110,000 polyethylene bags" of "bagged urea granules." There seems little doubt that a clean on–board bill of lading would be accorded substantial weight in a claim against the ocean carrier.[24] Insurer argues, however, that the bill of lading is simply a hearsay document as respects the claim against Insurer, and has no probative value. We find these arguments without merit.

■ Suffice it to say at the outset that the bill of lading cannot be dismissed as mere hearsay. Although the bill of lading was admitted in this case without objection, it clearly could have been admitted over objection as a record of regularly conducted activity which, under the Federal Rules of Evidence, is an exception to the hearsay rule. See, Fed.R.Evid. 803(6).

We also believe that the probative value of the bill of lading cannot be readily dismissed. The importance of the bill of lading as a commercial document is evident. Ocean bills of lading have been treated as negotiable instruments for well over a hun-

---

24. This Court recently held in *Blasser Bros. v. Pan–American Line*, 628 F.2d 376, 381, —— A.M.C. —— (5th Cir. 1980):

> [2] A bill of lading is prima facie evidence that the carrier received the goods as described therein and creates a rebuttable presumption that the goods were delivered to the carrier in good condition. *Associated Metals & Minerals Corp. v. M/V Rupert De Larringa*, 581 F.2d at 101; *Horn v. Cia de Navegacion Fruco, S.A.*, 404 F.2d 422, 435 (5th Cir. 1968), *cert. denied*, 394 U.S. 943, [89 S.Ct. 1272, 22 L.Ed.2d 477] (1969); *E. T. Barwick Mills, Inc. v. Hellenic Lines Limited*, 331 F.Supp. 161, 164 (S.D.Ga. 1971), *aff'd*, 472 F.2d 1406 (5th Cir. 1973). In other words, the plaintiff's prima facie case regarding receipt by the carrier in good condition is satisfied by the introduction into evidence of the clean bill of lading. *Emmco Insurance Co. v. Wallenius Caribbean Line, S. A.*, 492 F.2d 508, 513 (5th Cir. 1974); *Cummins Sales & Service, Inc. v. London and Overseas Insurance Co.*, 476 F.2d 498, 500 (5th Cir. 1973), *cert. denied*, 414 U.S. 1003, 94 S.Ct. 359, 38 L.Ed.2d 239 (1973); *Interstate Steel Corp. v. S. S. "Crystal Gem"*, 317 F.Supp. 112, 118 (S.D.N.Y. 1970).

dred years. Gilmore and Black, The Law of Admiralty (2d Ed. 1975) § 3–2 p. 94. They have been accorded the status of full negotiability under Federal law in both the Federal Bills of Lading Act (1916),[25] popularly called the Pomererene Act, and the Carriage of Goods by Sea Act (1936).[26] As negotiable instruments, ocean bills of lading are regularly relied upon by sellers, buyers and banks in the negotiation of transactions throughout the globe, and the record indicates that they were so relied upon in this case. Their reliability is further assured in that the ocean carrier, by issuing a clean bill of lading, binds itself and is only discharged upon actual delivery of the goods to the holder of the bill.[27]

■ We conclude that the trial court, as a general matter, was entitled to assign probative weight to the clean bill of lading in determining that the urea was loaded aboard the AIDA in good order and condition. Furthermore, we feel that the particular circumstances of this case give additional probative weight to the bill of lading. First, the record shows that the bill of lading was signed by the carrier and there is no evidence that any agent of the carrier filed a protest to the bill of lading. See, *United States v. Westchester Fire Ins. Co.,* 154 F.Supp. 827 (S.D.N.Y. 1957). Second, this is not a case in which it is alleged that the commodity itself (i. e. the urea) is inherently defective and therefore "the internal condition is not adequately revealed by external appearances." *United States v. Lykes Bros. Steamship Co., Inc.,* 511 F.2d 218 at 223 (5th Cir.); *Compagnie De Navigation v. Modial United Corp.,* 316 F.2d 163, 170, 1963 AMC 946, 951 (5th Cir. 1963). Rather, it is alleged that the bags themselves were inherently defective, a condition which presumably would have been readily observable during loading.

■ Insurer further attacks the probative value of the bill of lading by arguing that proof of spillage during loading effectively negates the inference that the cargo was in good order and condition at the time the policy attached. The answer to this contention partially lies in the express terms of the insurance policy which provides: "this insurance attaches from the time the goods leave the warehouse and/or store at the place named in the policy for the commencement of the transit and continues during the ordinary course of transit ..." It is clear, therefore, that any spillage which may have occurred during loading, occurred after the insurance policy attached. Additionally, there is substantial evidence in the record from which the Court could have reasonably inferred that some spillage of a bagged product during loading is not an unusual event. We do not find that evidence of spillage during loading is so necessarily inconsistent to override the finding of good order and condition of the cargo at the time the insurance policy attached.

Upon a review of the record, we are not able to say that the trial court's finding that the cargo was in good order and condition at the time the policy attached is clearly erroneous. We find, therefore, that the District Court correctly held that Morrison sustained its burden of showing loss of and damage to the cargo.

### Bad Stow or Bad Bags? (Insurer's Burden)

We now examine Insurer's burden of proof. As discussed previously, the Court correctly found that Insurer had the burden of showing an exception to coverage. Insurer claims it made such a showing and thus sustained its burden.

The Court found that the damage to the urea, except that in the number four hold, arose from two principal causes. First, spillage during loading that was not cleaned up caused many of the bags to be wet and slippery at discharge resulting in many

---

**25.** 49 U.S.C.A. §§ 81–124; Gilmore and Black at p. 95.

**26.** See, 46 U.S.C.A. § 1303(4); Gilmore and Black at p. 95.

**27.** Id. at p. 96.

bags being dropped or sliding off the unloading pallets. 446 F.Supp. at 418. Second, improper stowage of the cargo, including haphazard stowage and the absence of sweat battens and proper dunnage to protect the bags from metal parts of the ship, caused many of the bags to be distorted and damaged. Id. The court further found that "[t]he evidence does not establish that the urea bags were insufficient for the purpose used or that their quality was misrepresented."

With respect to the Court's holding concerning the quality of the bags, Insurer does not contest that portion finding no misrepresentation. Insurer does contest, however, that portion of the holding concerning the sufficiency of the bags, contending that this finding is clearly erroneous. Before reviewing this fact finding concerning the sufficiency of the bags, we emphasize that the precise question which we must examine is not whether the bags were ideally suited for transporting urea or whether some other bag would have been preferable for this purpose, but rather whether a defect in these bags was the real cause of damage to this urea. Furthermore, we emphasize that we cannot make a review concerning this causation question in a vacuum. We must examine the Court's finding concerning the sufficiency of the bags next to the Court's finding that the damage was actually caused by improper stowage and spillage during loading. Finally, we must bear in mind that Insurer had the burden of proof on this issue and that the Court's findings will not be disturbed unless clearly erroneous.

■ A considerable amount of testimony and evidence was introduced at trial directed to this hotly contested question concerning the precise cause of damage to the urea. In reviewing the District Court's fact findings on this issue, we are compelled to review the rather voluminous record. For purposes of simplification, we will examine first the court's findings that the damage was caused by improper stowage and spillage during loading. We will then review the court's finding that the damage was not caused by insufficient bags.

### (i) Bad Stow

We review first the District Court's finding that improper stowage was a principal cause of damage to much of the cargo of urea. There was certainly substantial testimony in the record from which the Court could have drawn this conclusion. Insurer argues, however, that this testimony is either not probative or should not be credited.

Thomas Roy Taylor, the stevedoring superintendent in charge of discharging the AIDA, testified by deposition. In his opinion the lack of sweat battens and dunnage on the AIDA had an adverse effect on the cargo, causing bags to be torn and distorted.[28] It is true, as Insurer points out, that

---

**28.** The following colloquy between counsel for Morrison and Taylor is instructive and is therefore quoted at length:

Q. Now, how would the bags get out of shape and distorted?

A. Well, first of all, as I explained awhile ago, lack of dunnage being used as the cargo was loaded; secondly, lack of sweat battens.

Q. What are sweat battens? Would you describe them for the Court, because the Court may not know that?

A. Yes, sir. Sweat battens are heavy timbers, normally two by six timbers, that are mounted along the sides of the skin of the ship. These sweat battens protect the cargo from the skin of the ship from rubbing directly on the metal and/or any sharp objects that might be protruding, such as any valve or things of that nature.

\*　\*　\*　\*　\*　\*

Q. ... Would you describe where the sweat battens would normally go, and the function they would normally perform?

A. Yes, sir. Sweat battens would run ....

Q. Fore and aft?

A. ... fore and aft.

Q. Along the skin?

A. Yes, sir, along the skin of the ship to protect them from any upright ribs.

\*　\*　\*　\*　\*　\*

Q. Now, where would the battens be in relation to the ribs ...?

A. The battens would be placed directly on the outside of the ribs. Normally a ship would be fitted with something to hold the battens in place.

Q. I see. Did the lack of cargo battens on this load of urea onboard the motor vessel Aida, back in April of 1974, have any effect on

Taylor also testified that spillage of urea was encountered throughout the stow and that improper stowage was not the cause of all this spillage. It does not appear that this testimony significantly aids Insurer's argument, however, as Taylor testified that in his opinion this wide spread spillage occurred during loading and was never cleaned up—testimony consistent with the Court's finding as to the other principal cause of damage to the urea. Finally, Insurer attacks Taylor's fairly damaging testimony by pointing out that Taylor was not asked about the adequacy of the bags. Clearly though, Taylor's failure to testify on this issue does not detract from the probative value of his testimony on other scores.

Robert S. Matthews, Assistant Manager of the stevedoring company which discharged the AIDA, testified at trial. Matthews was present during the unloading operation and was also of the opinion that lack of sweat battens and proper dunnage caused an excessive amount of rupturing of the bags. In answer to a hypothetical question, Matthews testified that if the AIDA had been properly fitted with sweat battens and dunnage, and if any spillage had been cleaned up during loading, probably only one percent of the bags, except those in the number four hold, would have broken.[29]

the condition of the cargo when you were discharging it?

A. In my opinion, yes, they did.

Q. Tell the Court what effect you observed?

A. Okay. Whether or not battens were used in this particular case here, a bag of cargo would be, while being soft when laid in the ship, wrapped around a vertical or horizontal rib, not protecting the bag ... the bag had no protection from the ribs or the skin of the ship, whatsoever, causing, I'm sure, some breakage, spillage and distorted looking bags.

Q. Now, with respect to dunnage, you have mentioned the dunnage which you suggested under the layers, do you also find dunnage in any other areas normally—stanchions or ladders?

A. Yes, sir, you find dunnage normally around the ladders, any king posts, any metal obstruction in the hold or tween deck of the vessel.

Q. Did you find that to be the case onboard the motor vessel Aida?

A. No, sir, I did not.

Q. Tell the Court what affect that would have on the bagged urea?

A. It would have the same effect that the lack of sweat battens would have. It would cause the bags to be torn, distorted .... see rust stains.

Q. In connection with discharging the motor vessel Aida back in April of 1974, you mentioned that the spillage, which you suspected was present at loading, caused problems for you. Did the distortion of the bags or the areas adjacent to the skin of the ship cause any problems for you?

A. Yes, sir.

Q. Tell the Court what problems you encountered with relation to those areas?

A. Well, if the bag is, if I may say, out of shape or distorted, it makes it difficult to be placed on the pallet board in the proper fashion.

Q. How will that affect your rate of discharge?

A. It can slow you down tremendously, if you run into that frequently.

Q. Did you run into it frequently on the motor vessel Aida?

A. Yes, sir, we did. With no dunnage or sweat battens, it was all over the fore and aft bulkheads and the skins of the ship.

Q. The entire length?

A. Yes. Where the cargo was stowed, yes.

29. The following is the exchange between Matthews and counsel for Morrison:

Q Now, Mr. Matthews, based upon your knowledge, training and experience, your acquaintance with the problems associated with discharging the Motor Vessel AIDA, and these 50 kilo bags of urea, I want you to assume that there was no spillage of urea on loading; that the bags were loaded into the vessel without any spillage, that the vessel was adequately equipped with sweat battens, that the stanchions and other metal work were adequately dunnaged and protected the cargo; that there was no flooding of the number four lower hold, and I want you to tell the Court what, in your opinion, you would have experienced in the way of problems on unloading the cargo and how much breakage you would have experienced.

&ast;&ast;&ast;&ast;&ast;&ast; * * * * * *

A If only sound bags had been left in the vessel, the broken bags and the spillage had been taken out as the vessel loaded, and with the vessel properly fitted with adequate protective materials for the benefit of the cargo, and of course, number four lower hold having not been flooded, I believe I would have done probably twice the tons per hour, which is about what I based my original quotation on and I would say that you would probably have witnessed one percent broken bags.

* * * * * *

Insurer, attacking Matthews' testimony based on what it contends are prior inconsistent written statements, points first to a letter dated April 11, 1974, from Matthews to Morrison in which Matthews wrote:

> The bags appear to be inadequate, as compared to a normal import/export package, allowing them to readily break out at the seams and/or tear during routine handling.

However, when questioned about this letter, and specifically about his failure to mention improper stowage as a cause of loss, Matthews testified that at the time the letter was written, discharge operations had just gotten underway and all the problems could not yet be observed. The trial judge was entitled to credit this explanation.

Perhaps of greater impeachment value was a later handwritten account by Matthews of the discharge of the AIDA written after discharge was complete. After citing the problem of loose urea being left in the stow during loading, Matthews wrote:

> This condition of loose urea tended to compound itself, due to the bags being of insufficient strength or faulty sealing the bags easily parted at the seams or split during normal handling or, in many cases, just being walked on by longshoremen. In either case, they did not stand up to a normal stevedoring operation.

However, in the same account, Matthews also wrote:

> Another cause of split bags was due to generally poor stowage in the vessel, especially when bags were placed between

the frames. The vessel was almost void of sweat battens, which would have prevented the cargo coming into contact with the metal frames.

The trial judge was entitled to conclude in Matthews' handwritten account he did not ascribe all of the loss of urea to the inadequacy of the bags. Matthews was extensively examined at trial, and it is well settled that a prior inconsistent statement does not necessarily destroy the probative value of subsequent testimony. Once again we conclude that the trial judge was entitled to credit Matthews' testimony.

Robert Trowbridge, an officer of Morrison,[30] was present during certain portions of the discharge of the AIDA, and also testified as to the inadequacy of the stow as a principle cause of damage to the urea.[31] Like Matthews, however, Trowbridge had committed certain observations to writing which appeared to lay the problem primarily with the bags. In a letter dated April 18, 1974, Trowbridge wrote:

> Let's hope the next vessel will be in export bags and maybe this expensive lesson will enable us to profit in the future.

Questioned about this letter, Trowbridge explained that at the time it was written he was concerned about the disaster he was facing and hoped that whatever had caused it could be avoided in the future. Although the letter certainly reflected on Trowbridge's testimony, the trial judge was entitled to credit this explanation.

---

THE COURT: From what? From what, the one percent?

THE WITNESS: Just normal damage during a stevedoring operation, Your Honor. It would have been ultimately from spillage, yes.

THE COURT: But that is normal?

THE WITNESS: I think that would be normal in the industry, yes, sir.

30. Trowbridge actually described himself as an officer of Agro Marketing Co. However, for purposes of this case the District Court treated Morrison and Agro Marketing as a single entity (446 F.Supp. at 417), and so do we.

31. [T]here were large iron girders, I'd call them. This material was stacked around the girder and piled up throughout the hold. Al-

most every bag that they pulled away from the side of her, if it was against one of these iron girders, would have a spot in it where it had, by the vibration of the vessel as it traveled across the sea, had worked a hole through it and as they picked them up, the Urea would fall out.

Well, this created a very serious problem, as it was hydroscopic, as they would lift this bag up, and you can imagine a hundred and ten pound bags, it took two men to do it, some of this Urea would fall out of these. The Urea would draw moisture and this would cause a severe problem, and they finally were told by the stevedoring—the people unloading these vessels, they would not unload the vessel under those conditions.

In addition to these three witnesses, others testified as to the inadequacy of the stow, including at least one witness called by Insurer. William Mercer, a Kearney employee who visited the vessel once during discharge, testified in his opinion the AIDA was badly loaded and cited specifically the lack of sufficient dunnage. E. G. Rees, an independent marine surveyor who performed survey work for Insurer on three separate occasions during discharge, while citing inadequate bags as the principal cause of loss also conceded that sweat battens and dunnage would ordinarily be expected to be found on this type of cargo.

Insurer does not appear seriously to controvert what the trial judge determined to be the other principal cause of damage to the cargo–spillage during loading. A number of witnesses testified that uncleaned up spillage during loading created a hazardous condition because the hydroscopic nature of the urea caused the bags to become wet and slippery occasioning additional damage during discharge. Insurer concedes that while this may be true, any spillage during loading was only symptomatic of what it contends to be the principal cause of damage, the inadequacy of the bags. We now review briefly the evidence concerning the adequacy of the bags.

(ii) Bad Bags

A number of witnesses for Insurer who observed the discharge of the AIDA testified as to the inadequacy of the bags. Rees, who performed survey work on behalf of Insurer, testified that:

> The bags were bursting at the ends, which was heat sealed, I guess electrically, welded on the end to close the bag and this condition was fairly common throughout the stow.

James E. Barry, who performed a survey of the discharge on behalf of the stevedore also testified as to the inadequacy of the bags. He stated in his deposition that he encountered spillage throughout the vessel attributable to improper heat seals on the bags. He also wrote in his survey report that:

> It is the opinion of the undersigned that not only is a one–ply plastic bag of insufficient strength to withstand being handled innumerable times but that the heat seal cohesive ends have either a manufacturing fault or an inherent deficiency.

This testimony as to the inadequacy of the bags was specifically controverted by Trowbridge. Trowbridge stated that he thought the bags were adequate based upon his observation of the bags being placed into sacks and upon his climbing over the piles of bags in the warehouse after discharge to determine their adequacy for further shipping by rail.

Two expert witnesses who did not view the actual discharge of the AIDA, one for Insurer and one for Morrison, also testified as to the adequacy of these or similar bags. Henry Gagnon, a chemist, examined one of the bags which was damaged and determined that the bag failed directly below the heat seal area at the top of the bag. However, as Gagnon conceded, this test of one bag did not represent a random sample of damaged bags under ordinary scientific and engineering standards. Captain John Brewster, an independent marine surveyor with 12 years surveying experience, testified at trial on behalf of Morrison. He stated, based on his experience with other cargoes of similar type bagged fertilizer or urea, that the type of bag used for the AIDA cargo does not normally cause any problem for stevedoring concerns. He also testified that if sweat battens were not employed in the ship, breakage of bags could be expected.

In the final analysis, it appears from the total record that creditable evidence would have supported a trial court finding that the bags were inadequate and that this was the principal cause of loss of the urea. However, the Court did not so find. Instead, on creditable evidence and testimony the Judge concluded that the bags were in fact adequate and that the principal cause of loss was improper stowage and uncleaned up spillage during loading. In choosing between plausible, but controverting, explanations as to the cause of an event,

the trial judge clearly sits in a better position than we do. Unlike us, the trial judge is able to view the demeanor of the witnesses and judge their credibility. Upon review of this record, we are unable to say that the trial court's determination that Insurer failed to carry its burden of proof in showing that defective bags caused the damage to the urea is clearly erroneous.

### Damages

The District Court awarded Morrison a total of $165,485.36 as damages for the loss of and damage to the urea. Insurer raises seven claims of error with respect to this damages award.

#### (i) Extra Stevedoring Costs

The Court awarded Morrison $76,658.78 in damages for extra stevedoring costs. Insurer is correct in its contention that this figure was arrived at by simply deducting the projected discharging costs from the actual expense.[32] Insurer argues that Morrison has established only that its actual costs for discharging the AIDA were greater than projected. Morrison did not prove, and did not attempt to prove, Insurer claims, the extent to which the additional stevedoring expense was incurred because of insured damage, and thus the District Court saddled Insurer with an expense that Morrison would have incurred in any event. We believe that the District Court, from the evidence before it, was entitled to award Morrison damages for extra stevedoring costs. We further believe that the amount awarded is not clearly erroneous.

It is not disputed that on January 28, 1974, Matthews, of Ryan–Walsh Stevedoring Company, furnished Trowbridge, of Morrison, with a stevedoring quotation of $7.20 per gross ton for discharging the AIDA. Insurer argues, however, that this quotation was much too low, primarily because Matthews had had no experience with single–ply plastic bags and had never been involved in discharging a shipload of cargo in plastic bags. This argument is based on the assumption, of course, that plastic bags are necessarily much more difficult to discharge than other types of bags—an assumption not clearly established by the evidence. In fact, Matthews was questioned on this point and testified that if the spillage had been cleaned up at the time the vessel was loaded, the vessel had been properly fitted with dunnage and sweat battens, and the number four hold had not been flooded, "I believe I would have done probably twice the tons per hour, which is about what I based my original quotation on . . .". We do not believe that simply because Matthews may not have had extensive experience with plastic bags that the Court was required to conclude that his original estimate for discharging the AIDA was necessarily out of line.

Insurer seeks further to bolster its attack on the cost estimate for discharging the AIDA by pointing out that the stevedoring company charged higher rates for discharging subsequent vessels containing cargo in plastic bags. However, the fact that the company may have changed its rates for subsequent vessels, even if based on the company's experience with the AIDA, is but a circumstance to be weighed by the trier of fact. Accordingly we affirm the District Court's award of damages for extra stevedoring costs.

#### (ii) Policy Deductible

Insurer next contends that the Court's application of the policy deductible was clearly erroneous. The District Court deducted $831.58, a figure apparently calculated based on the amount of the damages award rather than upon the insured value

---

32. The District Court calculated the extra stevedoring costs as follows:

| | |
|---|---:|
| Stevedoring charges due to condition of cargo on board the M/V Aida | $ 87,937.50 |
| Bulking and loading junked urea | 7,613.97 |
| Cleaning out ship to reclaim wet bulk material in ship | 5,158.31 |
| Loading out urea into rail cars | 30,217.00 |

| | | |
|---|---|---:|
| Total for discharging and loading out in its damaged condition | | $130,926.78 |
| LESS: | Amount of stevedoring and loading out charges if cargo had not been damaged | 54,268.00 |
| | Morrison's extra cost due to damaged condition of cargo | $ 76,658.78 |

446 F.Supp. at 419.

of the cargo.[33] Morrison does not contest Insurer's contention that the deduction was erroneously low and we remand for a re–determination of the proper figure.

### (iii)  Non–Delivered Urea

Morrison recovered $32,139.42 for non–delivered urea. This figure was calculated based on 143.6 short tons of non–delivered cargo valued at $187.38 per ton.[34] Insurer argues first, that the District Court's valuation of the urea is clearly erroneous, and second, that the Court's calculation of the amount of non–delivered cargo is also clearly erroneous. Insurer further claims that even assuming that the District Court's base figures are proper, the Court's multiplication produced an erroneously high total damage figure for non–delivered urea.

At the outset, we are convinced—on the basis of our own calculations [35]—that Insurer's contention as to the multiplication error is correct. Without more, Insurer is clearly entitled to a remand on this point.

■ This brings us to Insurer's principal points of error. Focusing first on the question of valuation it claims that the urea should have been valued at $181.22 per short ton. In arriving at this figure, Insurer relies on the total insured value of the cargo as set out in the special marine policy.[36] But this argument ignores entirely the open marine policy which contains a paragraph specifically directed at the question of valuation:

> 10.  *Valuation:*
>
> Valued at the amount of invoice, plus any pre–paid, advanced and/or guaranteed freight not included in the invoice and all

other charges not included therein to destination, plus 10% added thereto ...

Since the cargo was purchased by Morrison on C.I.F. Gulfport terms, the District Court was clearly entitled to rely on what Morrison paid for the urea, $1,038,954.24, in calculating damages—a figure which when factored out produces an insured value of $187.38,[37] the same figure which the District Court reached.

■ Insurer argues, however, that there is a patent flaw in relying on the open cargo policy, as that policy was not physically in existence until April 25, 1974, after the AIDA had been discharged. Insurer's argument ignores the fact that under its own express terms, the open cargo policy, properly executed by Insurer, was effective as of September 21, 1973.[38]

■ Insurer next claims that the Court's calculation of the amount of non–delivered cargo is also clearly erroneous—a claim which appears to have some merit. The District Court placed the amount of non–delivered cargo at 143.6 short tons, but did not demonstrate how it arrived at this figure. Insurer argues, on the basis of calculations which we omit here, that the maximum amount of non–delivered cargo that could have been calculated was 136.75 short tons. To make matters worse, Morrison now offers calculations of its own which purport to show that the amount of non–delivered urea should actually have been placed at 168.75 short tons, apparently arguing for the first time that the weight of the bags should have been deducted. About the only thing that can be said of this impasse is that we have no way of knowing how the District Court arrived at

---

**33.** Calculation of the deductible based on the total insured value of the cargo, rather than on the total loss of the cargo, yields a figure in excess of $5,000.00.

**34.** The District Court calculated the damages for non–delivered cargo as follows:

> Product not delivered from the M/V Aida, 143.6 short tons at $170.35 per ton, plus 10% per policy terms, or $187.38 per ton                    32,139.42

446 F.Supp. at 419.

**35.** 143.6 tons × $187.38 per ton = $26,907.77.

**36.** $1,099,201.14 (total insured value cargo) ÷ 6,063.75 short tons (5,500 metric tons) = $181.27 per short ton.

**37.** $1,038,954.24 (amount paid by Morrison for urea) ÷ 6,063.75 short tons (5,500 metric tons) = $170.35 per short ton × 10% (as mandated by valuation paragraph in open marine policy) = $187.38 per short ton.

**38.** See, n.3 *supra.*

its figure, or even if the District Court was made aware of these uncertainties. We, therefore, remand for further proceedings on this point to articulate why the figure it arrived at is appropriate or make such further adjustments as required for allowance of the total damages due Morrison for non-delivered cargo using proper mathematical computation. The Court may allow such further evidence as it deems appropriate.

### (iv) Loss Attributable to Bulk Urea

The District Court determined that Morrison was entitled to $57,518.74 for loss attributable to salvaged bulk urea.[39] Insurer assigns two points of error to the court's valuation. First, Insurer claims that Morrison failed to show that $187.38 per ton was the "fair market value" of sound urea at Gulfport. Second, it argues that the evidence does not justify the valuations placed on the various quantities of bulk urea.

We can quickly dispose of Insurer's first argument. The dispute in this case is not between cargo and the carrying vessel, rather it is between an insured and its insurer. Whereas in the former case, the cargo interest in its recovery for salvaged product would clearly be required to show the fair market value of the sound cargo, in the latter case the matter is governed by the insurance contract. Morrison, as insured, was only required to show, therefore, the sound insured value of the bulk urea—which was clearly $187.38.[40] This is a classic case where the District Court used the wrong language—"fair market value"—but achieved the right result.

We find Insurer's attack on the valuations placed by the District Court on the various quantities of bulk urea to similarly

be without merit. At the outset, it is evident that Morrison suffered some loss due to the cargo being in bulk condition. Trowbridge, for instance, testified that Morrison had "serious problems" with the bulk product. Furthermore, the District Court was entitled to rely on Trowbridge's testimony concerning the value of the salvaged bulk. On review of the record, we find no evidence which suggests to us that the valuations are clearly erroneous.

### (v) Overtime

Insurer next attacks the District Court's award of damages to Morrison for overtime stevedoring costs, an element of damages of the extra stevedoring costs. Although the District Court did not expressly assign a figure for overtime compensation, Insurer maintains the figure used was $9,619.11—a figure which we accept for purposes of discussion. We first reject the argument that there is no evidence that the cargo damage necessitated overtime work. Matthews, of the stevedoring company, testified that but for the damage to the cargo, his crews could have done twice the tonnage. We also uphold the trial Court's implicit rejection of the argument that any overtime actually arose because of a labor shortage in the Gulfport area at the time of the discharge and because one of the discharge days fell on Good Friday. These arguments are speculative at best. Accordingly, we do not reverse and remand on this point.

### (vi) Cleaning Out Ship

Insurer claims that the $5,158.31 awarded by the District Court for cleaning out the AIDA to reclaim wet bulk urea (446

---

**39.** The District Court calculated the damages for salvaged bulk urea as follows:

| | |
|---|---:|
| Product not delivered from the M/V Aida, 143.6 short tons at $170.35 per ton, plus 10% per policy terms, or $187.38 per ton | 32,139.42 |
| Salvaged product: | |
| Fair bulk, 301.10 short tons, value on the dock | 39,143.00 |
| Wet bulk, 207.20 short tons, $43.33 per ton value on the dock | 8,977.98 |

| | | |
|---|---|---:|
| Junked bulk, 58.60 short tons at $10 per ton value on the dock | | 586.00 |
| Total | | $ 48,706.98 |
| Fair market value of 566.9 short tons at $187.38 per ton on the dock (at Gulfport in good condition) | | $106,225.72 |
| LESS: | Salvage value of damaged urea at Gulfport | 48,706.98 |
| | Loss sustained | $ 57,518.74 |

446 F.Supp. at 419–20.

**40.** See, n.37, *supra*, and accompanying text.

F.Supp. at 415), was not recoverable. There is no question that Morrison was not contractually obligated to clean out the vessel. Furthermore, Insurer has raised serious questions as to the reasonableness of this operation as a salvage venture.[41] Since the District Court did not expressly consider the question of reasonableness, we remand for reconsideration of this damages award.

### (vii) Loading Out Urea

■ We finally reject, as without merit, Insurer's claim that allowances for extra costs for loading out the urea in its damaged condition to rail cars was improperly granted. As with its attack on the award for extra costs for discharging the vessel, Insurer claims that the award here is too high because of the original low quotation by Matthews for loading the urea into rail cars. We reject this argument for the same reasons discussed concerning the quotation for vessel discharge.[42] We also find that there is testimony supporting a finding that the damaged condition of the cargo did in fact make it more difficult for the cargo to be loaded into the rail cars,[43] and consequently we uphold the District Court's finding on this point.

### Is There Pay for the Piper?

■ As its final major point of error, Insurer contends that the District Court improperly granted attorneys' fees to Morrison totaling $27,450.00, under Florida law governing insurance claims.[44] Insurer argues first, that the delivery requirement of Florida law was not met, and second, that there were no contacts between the insured transaction and the forum, so that application of the attorneys' fee law in this case is unconstitutional.

At the outset, we find that any rights which Kearney may have acquired under the insurance policy were fully preserved to Morrison, its assignee.

The District Court found that the insurance policy was delivered to Kearney in Tampa, Florida (446 F.Supp. at 417), which is sufficient to satisfy the requirement of Section 627.401(2)[45] that the policy be issued for delivery or delivered in Florida. *Blue Cross of Florida, Inc. v. Turner*, 363 So.2d 133, 135 (Fla. 1st DCA 1978). Insurer disputes the court's finding that the policy was delivered in Tampa, on the basis of what we consider to be a novel, but unmeritorious, contention. Insurer claims that the policy was actually delivered in New York to Fairfield & Ellis, which Insurer describes as Kearney's "agent". The argument then continues, the fact that Fairfield & Ellis subsequently forwarded the policy to Kearney is of no consequence because delivery of

---

**41.** Insurer claims, with arguable justification, that the cost of cleaning out the vessel far exceeded the value of the salvaged urea and thus Morrison failed to properly mitigate its damages.

**42.** See, n.32, *supra*, and accompanying text.

**43.** Matthews testified that the wet and slippery condition of the bags created the same problems in loading the rail cars as in discharging the vessel.

**44.** Florida Statute (1977) provides in pertinent part:

PART II
THE INSURANCE CONTRACT
* * * * * *
627.401 Scope of part II.—No provision of part II of this chapter shall apply as to:
* * * * * *
(2) Policies or contracts not issued for delivery in this state nor delivered in this state,
. . . .
* * * * * *

627.428 Attorney fee.—
(1) Upon the rendition of a judgment or decree by any of the courts of this state against an insurer and in favor of an insured or the named beneficiary under a policy or contract executed by the insurer, the trial court or, in the event of an appeal in which the insured or beneficiary prevails, the appellate court, shall adjudge or decree against the insurer and in favor of the insured or beneficiary a reasonable sum as fees or compensation for the insured's or beneficiary's attorney prosecuting the suit in which the recovery is had.
* * * * * *
(3) Where so awarded, compensation or fees of the attorney shall be included in the judgment or decree rendered in the case.

**45.** Id.

a policy to an agent is tantamount to delivery to the principal.

We conclude that, under the facts of this case, Fairfield & Ellis is more accurately characterized as agent for Insurer rather than as sole agent for Kearney [46]—a conclusion undoubtedly also reached by the District Court in finding that the policy was delivered in Florida. Delivery by a broker, acting on behalf of the insurer, or at most on behalf of both underwriter and insured, of an insurance policy in Florida is clearly sufficient to satisfy the delivery requirement of Florida law.

■ Insurer further argues that application of the attorneys' fees law in this case contravenes constitutional principles as there was no contact between the insured transaction and the forum. We do not reach the overarching constitutional question as we find that there were in fact ample contacts. Although the urea itself may not have been shipped from or to Florida, the sales transaction with Morrison, the insurance policy with Insurer, and the packaging and shipping terms for the urea were all negotiated by Kearney, a corporation with its headquarters in Florida. Insurer's claim of no contact between the insured transaction and the form is, therefore, without merit.

There was no error in the award of attorney's fees to Morrison.

### Dropping Anchor

Much of the urea shipped on the AIDA in 1974 never survived to fertilize the fruited plains of this fair land. Although we are powerless to correct all the consequential damages which may have been occasioned by the unfortunate loss of and damage to the urea,[47] perhaps this opinion will enable Morrison to be made whole for its pecuniary loss. The opinion of the District Court is affirmed in major part and remanded in minor part in accordance with this opinion.[48]

AFFIRMED IN PART; REMANDED IN PART.

---

**46.** As an example of the relationship between Fairfield & Ellis and Utica, the record shows that an agent for Fairfield & Ellis contacted the surveyor to perform the survey of the AIDA on behalf of Utica.

**47.** Damage to soil causing damage to crops causing higher food prices—a significant component of inflation which has not only caused damage to the average American consumer but which has also exacerbated this nation's balance of payments problem as well.

**48.** The costs of this appeal are taxed 80% to Insurer and 20% to Morrison. F.R.App.P. 39.