**FORMOSA PLASTICS CORPORATION (U.S.A.) and Formosa Plastics Corporation (Taiwan), Plaintiffs,**

v.

**Arthur Collwyn STURGE, Individually and as the Representative of all Members of those Syndicates Subscribing to Lloyd's Policy No. 79JC10328 and all Insurance Companies, Members of the Institute of London Underwriters, Severally Subscribing to Policy No. 79JC10328, Defendant.**

No. 84 Civ. 3498 (BN).

United States District Court, S.D. New York.

Oct. 16, 1987.

Haight, Gardner, Poor & Havens, New York City, for plaintiffs; Chester D. Hooper, John T. Viti, of counsel.

Symmers, Fish & Warner, New York City, for defendant; William Warner, of counsel.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge, United States Court of International Trade, sitting as a District Court Judge, by designation:

### Introduction

Formosa Plastics Corporation (U.S.A.) ("Formosa–USA") and Formosa Plastics Corporation (Taiwan) ("Formosa–Taiwan")[1] seek recovery of $287,696.49, plus interest, under an all risks open marine cargo insurance policy issued by defendant underwriters ("Underwriters") covering three shipments in late 1979 of a liquid chemical, ethylene dichloride ("EDC"), from the United States to Kaohsiung, Taiwan. The action falls within the admiralty jurisdiction of this court and was tried to the court.

Plaintiffs claim that the EDC became contaminated and thereby diminished in purity sometime after the cargo left the storage tanks on shore at the ports of loading in the United States and before the EDC entered the shore tanks at the port of discharge in Taiwan. Hence, assert plaintiffs, this in-transit damage to its EDC was covered by plaintiffs' all risks marine policy issued by Underwriters. On the other hand, Underwriters deny that any contam- ination of the EDC occurred, and also maintain that plaintiffs are barred from recovering under their insurance policy by reason of their failure to comply with the "Bailee Clause."

■ After hearing the testimony of two highly credible witnesses called by plaintiffs, examining nearly three hundred documents admitted at trial (including deposition transcripts) and considering the legal memoranda of counsel, the court concludes: (1) plaintiffs have established that the subject cargos of EDC incurred a loss of purity by contamination on the ocean carriers during the voyages to Taiwan; and (2) such loss or damage is covered by plaintiffs' all risks insurance policy issued by Underwriters.

The court further finds: (1) Underwriters failed to establish that the loss or damage to the EDC was excluded from coverage by an exception thereto under the insurance contract; and (2) plaintiffs complied with the Bailee Clause.

### FACTS

The court finds the following facts:

Early in 1979, Formosa–USA, through its broker Marsh & McLellan, Inc. ("M & M"), purchased from Underwriters an open marine cargo insurance policy covering shipments of EDC and other cargo (Exh. 1). The insurance contract issued by Underwriters covered plaintiffs' cargos for "physical loss or damage from any external cause" with certain specified exclusions. *Id.* The policy contained a "warehouse-to-warehouse" clause extending the coverage under the policy from the time that the cargo left the storage facilities in the United States to the time that the cargo reached the place of storage at Kaohsuing, Taiwan. Pursuant to the open cover policy, certain negotiable certificates of insurance were to be countersigned and issued by Formosa–USA to its consignee. In late 1979, Formosa–USA issued three certificates of insurance to Formosa–Taiwan cov-

---

1. At trial, Formosa–Taiwan (parent corporation of Formosa–USA) was joined in this action as a plaintiff (Tr. 10).

ering EDC transported in three tank vessels from ports on the Gulf of Mexico to Kaohsiung, Taiwan.

Thus, on October 16, 1979 Formosa–USA countersigned and issued to Formosa–Taiwan Certificate of Insurance No. C8498/100001 (Exh. 13) covering 5,000.98 metric tons of EDC in bulk valued at U.S. $2,035,402.93 to be shipped on October 17, 1979 from Baton Rouge, Louisiana to Kaohsiung, Taiwan aboard the BOW SPRING.

On October 17, 1979, EDC was pumped from two shore tanks at Baton Rouge into tanks 1C and 8C of the BOW SPRING. The preloading inspection report of the surveyor, E.W. Saybolt & Co., Inc., dated October 17, 1979 (Exh. 22), reports analyses of the EDC made by the supplier, ICI America. Saybolt's report shows that the preloading purity of the EDC was 99.91% for the north storage tank and 99.92% for the south tank (Exh. 22, p. 3). Purity analyses of the EDC after loading were performed by an independent laboratory, P.J. Heinrici of Pasadena, Texas, on September 24, 1980, and such analyses showed that the purity of the EDC from tank 1C was 99.48% and that the purity of the EDC in tank 8C was 99.47% (Exhs. 25, 26). The purity specification required by Formosa–Taiwan was 99.80%.

The BOW SPRING shipment arrived at Kaohsiung, Taiwan on December 3, 1979. Purity analyses of the EDC in the vessel's tanks were made by Formosa-Taiwan at its own laboratory and the results are included in Lloyd's Survey Report dated December 14, 1979 (Exh. 23). These results disclosed that the purity of the EDC from tank 1C was 99.9% while the purity of the EDC in tank 8C had dropped to 94.4%. Hence, plaintiffs incurred a loss of $48,206.00 arising from contamination of the EDC carried in tank 8C of the BOW SPRING, computed as follows: 2,180.747 M/T × (99.8% − 94.4%) × $370.00 × 110% [2] = $47,928.50 + Survey fee of $277.50. Total = $48,206.00 (Exh. 42).

On October 17, 1979, Formosa–USA countersigned and issued to Formosa–Taiwan Certificate of Insurance No. C8498/100007 (Exh. 14) covering 4,536.05 metric tons of EDC in bulk, valued at U.S. $1,846,172.35, to be shipped from Geismar, Louisiana on October 18, 1979 to Kaohsiug, Taiwan aboard the STOLT SINCERITY.

On October 18–19, 1979, EDC was pumped from two shore tanks at Geismar into tanks 12C and 13C of the STOLT SINCERITY. The supplier, Atlantic Richfield, made the purity analyses of the EDC in the shore tanks prior to loading and the results were reported by the loading surveyor, SGS Control Services, Inc., on October 23, 1979 (Exh. 29). Atlantic Richfield's purity test results reported by SGS were: 99.908% for storage tank ST–4; and 99.934% for storage tank ST–15. Atlantic Richfield also analyzed the purity of the EDC after loading and these results were submitted to SGS and recited in its report (Exh. 29). The after-loading test results reported by SGS were: 99.910% for tank 12C and 99.909% for tank 13C. *Id.* The purity specification required by Formosa–Taiwan was 99.80%.

On November 30, 1979 the STOLT SINCERITY arrived at Kaohsiung, Taiwan. Purity analyses of the EDC in the vessel's tanks were performed by Formosa–Taiwan at its laboratory and were reported in Lloyds' Survey Report of December 14, 1979 (Exh. 27). These tests by Formosa revealed that the purity of the EDC in tank 12C had remained relatively constant at 99.87% while the purity of the EDC in tank 13C had dropped to 95.0%. An analysis of mixed (or blended) samples from tanks 12C and 13C disclosed a purity level of 96.0%. Lloyds also reported that a reanalysis of the EDC stored in tanks 12C and 13C disclosed substantially identical test results (Exh. 28). Consequently, plaintiffs incurred an insured loss of $30,875.89 arising from contamination of the EDC carried in tank 13C of the STOLT SINCERITY, computed as follows (Exh. 61): 1,567.657 M/T × (99.8% − 95.0%) × $370.00 × 110% = $30,625.75 + Survey Fee of $277.50. Total = $30,875.89.

**2.** The EDC was insured at a value of $370 per metric ton plus 10%.

On December 3, 1979 Formosa–USA countersigned and issued to Formosa Taiwan Certificate of Insurance No. C8498/100010 (Exh. 15) covering 9,949.084 metric tons of EDC in bulk valued at U.S. $4,049,277.19 to be shipped from Houston, Texas on December 5, 1979 to Kaohsiung, Taiwan aboard the STOLT OKPO (renamed during the voyage as the STOLT CONDOR).

On December 5, 1979, EDC was transferred from four shore tanks at Houston to six tanks of the STOLT OKPO. The preloading purity of the EDC in the shore tanks was analyzed by the supplier, Dow Chemical, on December 1, 1979 and the test results (as reported by Dow on March 19, 1980) showed (Exh. 32): Tank 1229—91.1%; Tank 2524—99.1%; Tank 2527—91.1%; and Tank 2528—98.8%. The purity of the EDC after loading into the vessel's tanks and blending the EDC from different shore tanks was also analyzed by Dow on February 26, 1980, with the following results (Exh. 32): Tank 7CS—96.5%; Tank 7CP—94.6%; Tank 4CP—93.7%; Tank 4CS—99.00%; Tank 2CS 94.7%; and Tank 9CS—95.5%. The average preloading purity of the EDC in the shore tanks was 95.6% while the average purity of the EDC in the ship's tanks after loading was 95.5% (Exh 217, Tr. 82–83). At the time of the STOLT OKPO shipment, EDC was in short supply and thus Formosa–Taiwan agreed to accept a specification of 95% purity (Tr. 21).

On January 27, 1980 the STOLT CONDOR arrived at Kaohsiung, Taiwan. The purity of the EDC in the ship's tanks was analyzed by Formosa–Taiwan. However, purity analyses of the EDC were made only on the basis of samples taken from three of the ship's tanks, 7CS, 7CP and 9CS, due to fact that samples taken from ship's tanks 4CS, 2CS and 4CP contained all water or more than 50% water. The test results as reported in Lloyd's Survey Report (Exh. 33) were: Tank 7CS—91.57%; Tank 7CP—90.67%; and Tank 9CS—88.62% (Exh. 33). Plaintiffs therefore incurred a total loss of $208,614.60 arising from contamination of the EDC in the STOLT (OKPO) CONDOR shipment, calculated as follows:

| | | |
|---|---|---|
| Loss of Heavy End $370 × 455 MT × 110% | = | $185,185.00 |
| Loss in Reconditioning $370 × 45 MT × 110% | = | 18,315.00 |
| Refining Steam Loss $12.74 × 360 MT | = | 4,586.40 |
| Survey Fee | = | 528.20 |
| Total Loss: | | $208,614.60 |

The following facts were stipulated in the Pre–Trial Order:

(g) Formosa Plastics Taiwan filed claims with Underwriters through Lloyd's agent in Taiwan, Jardine, Matheson & Co., Ltd. ("Jardine"). Marsh filed the same claims on behalf of Formosa against Underwriters through the London broker, Bowring. The claims sought $48,206.24, $30,875.89 and $208,614.60, for contamination to cargo carried in, respectively, the BOW SPRING, STOLT SINCERITY and STOLT (OKPO) CONDOR. The claims also alleged shortage of cargo valued at $95,027.40 from the STOLT (OKPO) CONDOR shipment. The dates on which these claims were first served were, respectively, January 16, 1980, February 28, 1980 and March 12, 1980. The claim for the BOW SPRING was revised on May 26, 1980 and the STOLT CONDOR claim was revised on April 23, 1980.

(h) Formosa Plastics Corporation, Taiwan placed the owners of the vessels, A/S Rederiet Odjfell and Stolt-Nielsen, on notice of the above shortage and contamination claims, but did not pursue legal action against them or obtain an enlargement of time to bring suit from them.

(i) The one-year statute of limitations for suit against a carrier in connection with a claim for cargo loss or damage under the Carriage of Goods by Sea Act, 46 U.S.C. § 1303(6), expired for the three shipments, respectively, on December 3, 1980, November 30, 1980 and January 27, 1981, and the claims against the carrier are barred.

After review of plaintiffs' claims for contamination and shortage, Underwriters declined liability for the claims, but did ulti-

mately settle the claim for shortage.[3]

## DISCUSSION

### I.

█ The court initially considers the issue of contract interpretation presented by Underwriters' defense under the insuring agreement's "Bailee Clause" printed on the back of the insurance certificates (Exhs. 13, 14 and 15). This clause reads:

### IMPORTANT

### LIABILITY OF CARRIERS, BAILEES OR OTHER THIRD PARTIES

It is the duty of the Assured and their Agents, in all cases, to take such measures as may be reasonable for the purpose of averting or minimizing a loss and to ensure that all rights against Carriers, Bailees or other third parties are properly preserved and exercised. In particular, the Assured or their Agents are required:—

1. To claim immediately on the Carriers, Port Authorities or other Bailees for any missing packages.

2. In no circumstances, except under written protest, to give clean receipts where goods are in doubtful condition.

3. When delivery is made by Container, to ensure that the Container and its seals are examined immediately by their responsible official. If the Container is delivered damaged or with seals broken or missing or with seals other than as stated in the shipping documents, to clause the delivery receipt accordingly and retain all defective or irregular seals for subsequent identification.

4. To apply immediately for survey by Carriers' or other Bailees' Representatives if any loss or damage be apparent and claim on the Carriers or other Bailees for any actual loss or damage found at such survey.

5. To give notice in writing to the Carriers or other Bailees within 3 days of delivery if the loss or damage was not apparent at the time of taking delivery.

Note.—The Consignees or their Agents are recommended to make themselves familiar with the Regulation of the Port Authorities at the port of discharge.

Underwriters argue that plaintiffs are precluded from recovering under the policy because plaintiffs failed to commence a lawsuit against the ocean carriers or obtain an extension of the suit time. In essence, Underwriters maintain that by neglecting to preserve their putative subrogation right against the ocean carriers, plaintiffs failed to comply with the Bailee Clause and therefore forfeited their coverage under the insurance agreement. Plaintiffs, however, insist that by promptly filing claims against the ocean carriers for damage to the cargos, plaintiffs satisfied their obligation under the Bailee Clause, and that plaintiffs were not required to go further and sue the ocean carriers or obtain extensions of the suit time.

The issues presented by the Bailee Clause were initially raised by Underwriters before Judge Ward by motion for summary judgment. In his decision denying Underwriters' motion, Judge Ward observed that Underwriters' position rested "on an expansive interpretation of plaintiff's duty" under the clause, the language of which is not "wholly unambiguous," and that Formosa's reading of the Bailee Clause was sufficiently reasonable to raise a triable issue as to the parties' understanding of their respective contractual obligations. Additionally, Judge Ward found there were factual issues raised by Formosa concerning defendants' conduct implicating the possible waiver of any defense Underwriters might have under the Bailee Clause or the estoppel of Underwriters to rely on the Clause. *Formosa Plastics Corp. (U.S.A.) v. Arthur Collwyn Sturge,* Slip Op., 84 Civ. 3498 (S.D.N.Y. Nov. 12, 1986).

---

**3.** Formosa asserted a claim against Underwriters in the amount of $95,000 for shortage of 283.228 metric tons of EDC shipped on the STOLT OKPO. This claim was settled by the parties for $60,000 and therefore is not involved in this litigation (Tr. 4).

Plaintiffs vigorously dispute Underwriters' understanding of the Bailee Clause that would have required plaintiffs to commence an action against the vessel owners or obtain an extension of the suit time. On that score, plaintiffs rely on the well established rule of contract construction *ejusdem generis*[4] and point to the specific examples of acts delineated in the Bailee Clause that an insured is required to perform. From the enumerated exemplars it would appear that by claiming against the ocean carriers, plaintiffs adequately complied with the general language of the Bailee Clause requiring an insured to take reasonable measures to ensure Underwriters' rights against Carriers, Bailees or other third parties. In that regard, plaintiffs aptly point out that all of the required acts enumerated in the Clause concern action to be taken by an insured at the time it takes delivery of the damaged cargo or within three days thereafter. The short of the matter is that the acts of obtaining extensions of time to sue ocean carriers, or alternatively commencing suits, are totally dissimilar to and not *ejusdem generis* with the enumerated illustrative acts in the Bailee Clause.

In addition to the doctrine of *ejusdem generis*, plaintiffs properly invoke the well-settled rule[5] in construing insurance contracts that any ambiguity in the terms of the policy must be construed in favor of the insured. Thus, in *Vargas v. INA*, 651 F.2d 838 (2d Cir.1981), the relevant rules of construction were stated as follows:

Under New York law ... an ambiguous provision in an insurance policy is construed "most favorably to the insured and most strictly against the insurer." ... The insurer bears a heavy burden of proof, for it must " 'establish that the

words and expressions used [in the insurance policy] not only are susceptible of the construction sought by [the insurer] but that it is the only construction which may fairly be placed on them.' ... The insurer is "obliged to show (1) that it would be unreasonable for the average man reading the policy to [construe it as the insured does] and (2) that its own construction was the only one that fairly could be placed on the policy" [citations omitted].

651 F.2d at 839–40; *see also, Francis v. INA Life Ins. Co. of New York*, 809 F.2d 183 (2nd Cir.1987); *Duggan v. Travelers Indemnity Co.*, 383 F.2d 871, 876 (1st Cir. 1967); *Vernon v. Aetna Ins. Co.*, 301 F.2d 86, 90 (5th Cir.1962), *cert. denied*, 371 U.S. 819, 83 S.Ct. 33, 9 L.Ed.2d 59 (1962).

Plainly, Underwriters' interpretation of the Bailee Clause cannot be regarded as the only possible construction of the clause. Rather, plaintiffs' interpretation is eminently reasonable. The reasonableness of plaintiffs' interpretation of their insurance contract must be judged according to "the reasonable expectation and purpose of the ordinary businessman when making an ordinary business contract." *Bird v. St. Paul Fire & Marine Ins. Co.*, 224 N.Y. 47, 51, 120 N.E. 86 (1918). *See also, Miller v. Continental Ins. Co.*, 40 N.Y.2d 675, 676, 389 N.Y.S.2d 565, 566, 358 N.E.2d 258, 259 (1976); *Arthur A. Johnson Corp. v. Indemnity Ins. Co.*, 7 N.Y.2d 222, 227, 196 N.Y.S.2d 678, 682, 164 N.E.2d 704 (1959). Judged by the foregoing standard of an "ordinary businessman," the court finds that plaintiffs' reading of the Bailee clause was reasonable; accordingly, plaintiffs were not required to obtain an extension of suit time or to commence legal action against the ocean carriers.[6]

---

**4.** *See Corbin on Contracts*, § 552, pp. 203–205 (1960).

**5.** There is no conflict of laws dispute between the parties.

**6.** Underwriters emphasize that Formosa's insurance brokers, M & M., advised Formosa in claim acknowledgment forms (Exhs. 46, 47 and 54) that its "claim" would become "time-barred" one year from the date of discharge at destination and that if the "claim" was not settled

within this period, Formosa *"must secure an extension of the suit time from the carrier."* (Emphasis in original.) The terms "claim" and "carrier" as used by M & M in the context of a form acknowledging an insurance claim against *Underwriters* could be reasonably interpreted by Formosa to refer to its claim against the *insurance* carrier and not necessarily against the ocean carriers. Moreover, neither M & M nor Underwriters ever advised Formosa that it might be obligated to sue the ocean carriers.

## II.

The court turns to the issue of whether the EDC shipped by Formosa–USA to its parent company in Taiwan sustained any form of external physical damage or loss that was insured by Underwriters under the all risks marine cargo policy issued to plaintiffs.

Underwriters reject plaintiffs' claim that the EDC became contaminated on the vessels during the voyages to Taiwan on the basis of their chemist's report (Exh. 113). Plaintiffs, however, argue that the diminution in purity of the EDC in each of the three shipments is established by a comparison of the laboratory analyses performed at the loading ports and upon arrival in Taiwan. These analyses definitively show that the purity of certain portions of the cargos declined during the voyages. In addition to the laboratory analyses, plaintiffs adduced the testimony of an eminently qualified and highly credible expert witness, Dr. Carl C. Gryte, associate professor of chemical engineering at Columbia University, which establishes to the court's satisfaction that the EDC was contaminated during the voyages to Taiwan and not damaged by inherent vice of the cargos.

Notwithstanding the purity analyses and Professor Gryte's unrebutted testimony at trial, Underwriters insist that plaintiffs' proofs are inadequate to establish a *prima facie* case. Specifically, Underwriters contend that plaintiffs failed to submit evidence of: (1) the analytical method used at the loading ports and by Formosa–Taiwan; (2) the identity of the purported contaminant; (3) any change or enlargement in the volume or weight of the cargo in the ships' tanks carrying the allegedly contaminated EDC; (4) any improper or faulty condition of the relevant ships' tanks; and (5) any change in the purity levels of the allegedly contaminated cargos.

At the outset, it is instructive to review the burden of proof that the parties assumed in this case. In *Morrison Grain Company, Inc. v. Utica Mutual Insurance Company,* 632 F.2d 424 (5th Cir.1980), plaintiff claimed under an all risks marine insurance policy respecting urea lost during shipment from Romania to Mississippi. The insurer contended that Morrison had not sustained its burden of proving that the loss was not caused by an inherent vice or defect in the goods which existed prior to the period of coverage. On that aspect, the *Morrison* court rejected the insurer's argument, holding that the defense of inherent vice constituted "an exception to coverage the burden of proving which properly lies with the insurer under an 'all risks' policy." *Id.* at 431 (footnote omitted). Continuing, the court commented relevant to the respective burdens of proof in a case involving an all risks policy:

> By way of summary, to this point, we conclude that the District Court properly allocated the respective burdens of proof. Morrison, the insured, had the initial burden of proving a loss by showing that the cargo of urea was in good condition when the policy attached and in damaged condition when unloaded from the vessel. The burden then shifted to Insurer, to show exception to coverage.

632 F.2d at 431. *See also, Buckeye Cellulose Corp. v. Atlantic Mut. Ins. Co.,* 643 F.Supp. 1030, 1036 (S.D.N.Y.1986).

Following *Morrison* in the present case, "the burden was on the insured to show that some loss occurred during the period of coverage, *i.e.,* that the goods unloaded were not in the same condition or quantity as those loaded onto the vessel." *Banco Nacional v. Argonaut Insurance Co.,* 681 F.2d 1337, 1340 (11th Cir.1982).

■ Here, there is a dispute regarding whether any damage at all to the EDC (*viz.,* diminution of purity) occurred during the voyages or whether the apparent differences in the levels of purity reported at the loading ports and by Formosa–Taiwan resulted only from the use of different analytical methods by the chemists. Obviously, had Underwriters affirmatively established that different analytical methods used for testing the purity of EDC at the loading ports and in Taiwan were responsible for the test results, a different case would be presented. But Underwriters did not establish the foregoing as a fact. In essence, Underwriters attempt to place on

plaintiffs the burden of establishing that the apparent loss of purity was not due simply to analytical methodology. The court rejects such a proposed burden of proof in a case dealing with an all risks policy.

Granted some mystery surrounds the apparent damage to or loss in purity of plaintiffs' EDC in the three shipments. However, as observed in *Morrison:*

> The District Court correctly construed the policy here as an "all risks" policy. See, *Atlantic Lines Limited v. American Motorists Insurance Company*, 547 F.2d 11 (2nd Cir.1976). As has been recognized in other circuits, "it would appear that all risks insurance arose for the very purpose of protecting the insured in those cases where difficulties of logical explanation or some mystery surround the [loss of or damage to] property." [Footnote omitted]. It would seem to be inconsistent with the broad protective purposes of "all risks" insurance to impose on the insured, as Insurer would have us do, the burden of proving the precise cause of the loss or damage. [Footnote omitted]. It is not surprising, therefore, that courts which have considered claims under insurance policies with essentially the same insuring language as the policy before us *have consistently refused to require the insured to demonstrate that the loss or damage was occasioned by an external cause.* [Footnote omitted.] We similarly refuse to impose such a burden in this case.

632 F.2d at 430 (emphasis added). *Cf. Atlantic Lines Ltd. v. American Motorists Ins. Co.*, 547 F.2d 11 (2nd Cir.1976) (unexplained and mysterious disappearance of equipment held recoverable by insured under all risks policy without having to establish cause of loss).

In any event, the court is persuaded by Professor Gryte's unrebutted testimony that the apparent substantial diminution of purity was not the result of the employment of different analytical procedures. At trial, Professor Gryte testified that the analysis of EDC is common in the business, and that differing analytical methods would produce only slight variations due to such factors as repeatability, reproducibility and similar factors.[7] Gryte also noted without contradiction, that the "peaks" detected by gas chromatographic analysis were "very concrete indications that impurities were present in the material at discharge." (Tr. 82).

■ Underwriters further hypothesize that if any diminution in the purity levels of the EDC occurred on the vessels, such diminution resulted from some chemical decomposition or degradation, and hence, inherent vice. As held in *Morrison*, 632 F.2d at 431, the burden of proof regarding the presence of an inherent vice or a defect in the cargo rested squarely on Underwriters. *See also, Banco Nacional*, 681 F.2d at 1340. To sustain their burden of proof on the issue of inherent vice, Underwriters rely heavily on a report from their chemist, Minton, Treharne & Davies, Ltd. (Exh. 113). Essentially, the Minton report suggests the possibility that some form of chemical degradation caused the reduction in the purity of the EDC, but Underwriters' chemist admittedly lacked sufficient information to make any definitive conclusion in the matter.

Professor Gryte, on the other hand, presented very cogent testimony to the effect that the reduction in the purity of the EDC was not due to chemical degradation of the cargo, but rather resulted from contamination. Gryte's conclusions were based upon the facts, among others, that the EDC was loaded into two tanks of the

---

**7.** Underwriters point up that Dow Chemical blended aboard the vessel the EDC from shore tanks containing different purity levels and consequently the samples drawn from the ship's tanks after loading did not represent the cargo from any particular shore tank prior to loading (Exh. 171). However, plaintiffs are entitled to rely on Dow's preloading analyses of the EDC in the shore tanks (Exh. 32) since plaintiffs' cover- age under its policy extended from "warehouse to warehouse." Additionally, Professor Gryte checked the Dow analyses by comparing the preloading results with the results obtained after loading. The average results of both analyses were found by Gryte to be extremely close, *viz.,* 95.6% for the shore tanks and 95.5% for the ship's tanks (Exh. 127, Tr. 82–83).

BOW SPRING and two tanks of the STOLT SINCERITY, while the EDC in only one tank on each of the vessels outturned in damaged condition; logically, if an inherent vice such as chemical degradation had caused the damage, the EDC in both tanks of each of the vessels would have outturned damaged. (Tr. 54). Gryte opined that the unknown contaminant, referred to in the language of gas chromatography as a "peak," could not have been present in the cargo when it was loaded aboard the ship (Tr. 55–56, 70). Furthermore, Gryte's conclusion that the reduction in the purity levels of the EDC could not have resulted from chemical reactions inherent in the product is strongly buttressed by his examination of acidity, water saturation levels, and the fact that EDC is a chemically stable product in the environment in which it was shipped and therefore would not have readily reacted with water or other chemicals at room temperature or slightly above. (Tr. 53–54, 80–81).

In sum, the hypothesis of Underwriters' Minton report that chemical decomposition of the cargos was responsible for the reduction in the purity levels of the EDC was squarely contradicted by the highly credible testimony of Professor Gryte. Accordingly, the court dismisses Underwriters' suggestion that plaintiffs' loss could have been due to inherent vice.

■ Finally, plaintiffs were not required to prove the precise cause of their loss to demonstrate "fortuitousness." *See Morrison*, 632 F.2d at 430–431. There can be no doubt in this case that the damage to plaintiffs' EDC was fortuitous, *viz*, it was an event dependent on chance. *Id.*

### CONCLUSION

For the foregoing reasons, plaintiffs shall recover from Underwriters the sum of $287,696.49, plus interest and costs. Prejudgment and postjudgment interest shall be calculated using the formula prescribed in 28 U.S.C. § 1961(a)(1982). *See Columbia Brick Works, Inc. v. Royal Ins. Co.*, 768 F.2d 1066, 1070–71 (9th Cir.1985). Prejudgment interest shall commence to run on the sum of each claim against Un-

derwriters from the stipulated date that each claim was first submitted, as follows:

BOWSPRING: On the sum of $48,206.00, interest shall commence to run on January 16, 1980.

STOLT SINCERITY: On the sum of $30,875.89, interest shall commence to run on February 28, 1980.

STOLT CONDOR: On the sum of $208,614.60, interest shall commence to run on March 12, 1980.

Plaintiffs shall submit a form of proposed judgment, preferably after consultation with defendants and upon their consent, if possible, as to form. If the parties are unable to agree upon the form of judgment, a proposed judgment will be submitted by plaintiffs on seven days' notice and defendants will submit their specific objections and counter-proposals as to the disputed portions.

The foregoing constitutes the court's findings of fact and conclusions of law in accordance with Rule 52(a), Fed.R.Civ.P.