FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| INGENCO HOLDINGS, LLC, a Delaware limited liability company; BIO ENERGY (WASHINGTON), LLC, a Delaware limited liability company,<br><br>        *Plaintiffs-Appellants*,<br><br>v.<br><br>ACE AMERICAN INSURANCE COMPANY,<br><br>        *Defendant-Appellee.* | No. 16-35792<br><br>D.C. No.<br>2:13-cv-00543-RAJ<br><br><br>OPINION |

Appeal from the United States District Court
for the Western District of Washington
Richard A. Jones, District Judge, Presiding

Argued and Submitted June 12, 2018
Seattle, Washington

Filed April 15, 2019

Before:  Dorothy W. Nelson and Paul J. Watford, Circuit
Judges, and Dean D. Pregerson,[*] District Judge.

Opinion by Judge Pregerson

**SUMMARY**[**]

**Washington Insurance Law / Fed. R. Civ. 37 Sanctions**

The panel affirmed the district court's application of
Washington law and its discovery sanctions against
appellants, reversed the grant of summary judgment that was
entered in an insurer's favor, and remanded for trial in a
diversity insurance coverage case.

Appellants operate a gas purification plant in King
County, Washington.  Appellants' insurer, Ace American
Insurance Company, denied coverage when appellants sought
to recover for damages sustained after metal brackets broke
resulting in an eventual shutdown of the entire plant.

The panel held that the district court properly applied
Washington law to this insurance coverage dispute.

Concerning the insurer's argument that appellants' failure
to give notice of the initial failure and shutdown violated a

---

[*] The Honorable Dean D. Pregerson, United States District Judge for
the Central District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

condition precedent to coverage under the all risks policy, the panel held that there was a triable issue of fact as to whether the insurer was prejudiced by appellants' remedial actions.

Concerning the insurer's argument that the cause of the damage was an "external" force not covered by the all risks policy, the panel held that there was at the very least a triable issue of fact whether appellants' loss was fortuitous. The panel further held that a determination that a particular loss was fortuitous could obviate the need to examine whether that loss was caused by an external force. The panel concluded that the district court's grant of summary judgment to the insurer on the question of whether appellants' loss was the cause of an "external cause" must be reversed because the district court failed to consider the role of fortuity in all risks insurance disputes.

In *Vision One, LLC v. Philadelphia Indem. Ins. Co.*, 174 Wash.2d 501, 515 (2012), the Washington Supreme Court held that insurance ensuing loss clauses ensure that, where an uncovered event takes place, any ensuing loss which is otherwise covered by the policy remains covered, even though the uncovered event itself is never covered. Applying *Vision One* to the facts at hand, the panel held that even if it were conclusively established that appellant's diffuser shield suffered from some inherent defect, the subsequent destruction of absorbent beads would be covered under the policy's ensuing loss exception.

The panel held that there was a genuine dispute of material fact as to whether the policy's Boiler and Machinery endorsement applied to independently confer coverage for appellants' losses.

Assuming there was coverage, the policy covered business interruption losses for only the time required with the exercise of due diligence to rebuild the damaged property. The panel held that although appellants' actual time to repair might be relevant to the question whether the sixteen-month shutdown was consistent with the exercise of due diligence, it was by no means dispositive of the issue.

The district court determined that appellants willfully withheld evidence of damages on its state law statutory claims, and as a Fed. R. Civ. P. 37(c) sanction, the district court precluded appellants from introducing such evidence. The panel held that appellants failed to explain its failure to meet its affirmative obligations under Fed. R. Civ. P. 26. The panel also held that the district court did not abuse its discretion in sanctioning appellants for failure to disclose statutory damages information to the insurer, even though those damages resulted in the dismissal of appellants' statutory claims.

## COUNSEL

Philip A. Talmadge (argued), Talmadge/Fitzpatrick/Tribe, Seattle, Washington; Robert J. Rauch, Law Offices of Robert J. Rauch, Bow, Washington; for Plaintiffs-Appellants.

Anton Metlitsky (argued), O'Melveny & Myers LLP, New York, New York; Kimya Saied and Jonathan D. Hacker, O'Melveny & Myers LLP, Washington, D.C.; Michael L. Foran and Thomas B. Orlando, Foran Glennon Palandech Ponzi & Rudloff PC, Chicago, Illinois; for Defendant-Appellee.

**OPINION**

PREGERSON, District Judge:

Appellants operate a gas purification plant in King County, Washington.  In 2010, metal brackets securing a crucial component broke, resulting in damage to other components and an eventual shutdown of the entire facility.  Appellants' insurance carrier Appellee ACE American Insurance Company ("Ace"), denied coverage, and Appellants sued.  The district court, applying Washington law, granted summary judgment in Ace's favor and sanctioned Appellants for discovery violations.

We have jurisdiction under 28 U.S.C. § 1291.  We affirm the district court's application of Washington law and its discovery sanctions against Appellants, but reverse its grant of summary judgment in Ace's favor and remand for trial.

**FACTUAL AND PROCEDURAL  BACKGROUND**

**A.  Damage to the gas purification plant**

Appellants, Ingenco Holdings, LLC and its wholly owned subsidiary, Bio Energy (Washington), LLC (collectively, "Ingenco") operate a gas purification plant at the Cedar Hills landfill in King County, Washington.  The plant converts raw landfill gas into usable natural gas.  The final step of the purification process involves the removal of excess nitrogen from the landfill gas in a nitrogen rejection unit, or "NRU".  The gas is directed through adsorbent beads, to which nitrogen adheres, contained within pressure vessels.  The beads, which are essentially a filter medium, cannot withstand the direct pressure of the landfill gas inflow, which, if

unmediated, can grind the beads down into dust. To reduce the force of the gas flow on the beads, a "diffuser basket" is suspended from the top of, and surrounds, each bead-filled pressure vessel. The diffuser basket, in particular its perforated bottom plate, acts as a shield that prevents the full force of the incoming landfill gas from striking the beads directly. Instead, the incoming stream of gas strikes the diffuser basket's bottom plate first, is diffused, and then passes through the beads in the pressure vessel with reduced force.

The diffuser basket bottom plate, or shield, is secured to the rest of the diffuser basket by metal straps, or brackets. On October 1, 2010, the metal straps securing the bottom plate of pressure vessel number thirty-two's ("V32") diffuser basket broke and the bottom plate fell away, leaving the beads in V32 unprotected. The parties dispute the reason for the breakage. Ace maintains that the bottom plate flexed, leading to excess stress upon, fractures in, and ultimately failure of, the metal straps. Ingenco contends that the bottom plate could not flex unless subjected to pressures far greater than those present within the nitrogen rejection unit. Instead, Ingenco posits, the flow of landfill gas caused the bottom plate's metal straps to vibrate at a frequency that coincidentally matched the straps' natural vibration frequency, or resonant frequency.[1] These unforeseeable vibrations, Ingenco argues, caused the metal straps to change shape and break.

---

[1] Every material has a natural, or resonant, frequency at which it will vibrate if disturbed. *See*, *e.g.* https://www.scientificamerican.com/articl e/fact-or-fiction-opera-singer-can-shatter-glass/

Whatever the cause of the strap breakage, once the diffuser basket's bottom plate fell away from the assembly, there was no longer any shield in place to protect the adsorbent beads from the full pressure of the incoming stream of landfill gas.  The unmediated gas flow pulverized the 30,000 pounds of beads in V32 into dust, resulting in an automatic total shutdown of the facility on October 5, 2010.

Ingenco thought it had removed, or would be able to remove, the dust from all gas processing systems, and re-started the facility on October 13, 2010.  Unbeknownst to Ingenco, however, dust from the pulverized beads in V32 had infiltrated other parts of the system, including other bead-containing pressure vessels.  Dust from the V32 beads abraded against undamaged beads in the other pressure vessels, degrading those beads as well.  Eventually, the accumulation of bead dust forced an automatic shutdown of the plant in March 2011.  The plant remained idle for several months as Ingenco investigated alternative nitrogen filtration options and undertook repairs.  Ingenco did not begin cleanup or repair operations until November 2011.  The plant resumed operation in August 2012.

## B.  The insurance coverage dispute

Ingenco filed a property damage and business interruption insurance claim with Ace in May 2011.  Ingenco's all risks insurance policy, issued by Ace, covered against "all risks of direct physical loss or damage occurring . . . from any external cause."  The policy, however, excluded "[f]aulty or defective material, faulty workmanship, faulty methods of construction, [or] errors or omissions in plan or specification or designs . . . unless loss by a peril not otherwise excluded ensues . . . ."  The policy also excluded "[g]radual

deterioration, depletion, inherent vice, [or] latent defect . . ., unless such loss is caused directly by physical damage not otherwise excluded . . . ."  A separate Boiler and Machinery endorsement ("the Endorsement") covered property damage and business losses "resulting from an Accident" to a pressure vessel.  The Endorsement's definition of "Accident," however, excluded "depletion, deterioration[, . . . and] wear and tear."

Ace denied coverage on several grounds.  Ace claimed that, as a threshold matter, Ingenco failed to comply with a notification provision that required Ingenco to notify Ace of all losses.  Specifically, Ace claimed that Ingenco failed to notify Ace of both the October diffuser shield failure and the resulting loss of beads in V32 until May 11, when the plant shut down for the second time.  With respect to coverage, Ace took the position that Ingenco's losses were not caused by any "external" force, but rather from defects in the diffuser basket and the overly delicate adsorbent beads.  Thus, Ace reasoned, without an "external cause" there was no covered loss, and even if there were an external cause, coverage would nevertheless be lacking under the "defective material," "wear and tear," "deterioration," and other, similar exclusions.

## C.  Procedural history

Ingenco brought suit in the Western District of Washington, alleging causes of action for breach of contract and declaratory relief, as well as statutory claims under Washington's Consumer Protection Act and Insurer Unfair Conduct Act.  The parties eventually filed cross motions for summary judgment.  The district court granted Ingenco's motion insofar as Ingenco argued that Washington law should

apply to all claims, and that, under Washington law, Ingenco's alleged failure to comply with the policy's notice provision did not preclude coverage absent prejudice to Ace. The court ruled for Ace, however, that Ingenco's losses did not result from an "external cause," but rather from an "inherent problem in the system," which system had been designed to withstand the "external" force at issue, i.e., the landfill gas.

The district court also ruled that the "ensuing loss" exception to the "defective material" exclusion did not apply to create coverage because there was no covered loss in the first place. In a similar vein, the district court concluded that Ingenco's losses were caused by wear and tear resulting from normal operation, and therefore fell outside the Endorsement's definition of covered "Accident." Lastly, the district court ruled that, even in the event of coverage, business interruption losses would be limited to the "hypothetical" reasonable repair period, regardless of the actual time necessary to complete repairs.

In a separate order, the district court found that Ingenco had failed to timely disclose or produce evidence related to its state law bad faith claims. As a discovery sanction, the district court precluded Ingenco from introducing any such evidence and, accordingly, dismissed Ingenco's statutory claims for lack of proof of damages.

Ingenco now appeals the district court's orders.

**STANDARD OF REVIEW**

We review grants of summary judgment, and partial grants of summary judgment, de novo. *Flores v. City of San*

*Gabriel*, 824 F.3d 890, 897 (9th Cir. 2016). Discovery rulings, including the imposition of discovery sanctions, are reviewed for abuse of discretion. *R & R Sails, Inc. v. Ins. Co. of Pennsylvania*, 673 F.3d 1240, 1245 (9th Cir. 2012). A district court abuses its discretion if it bases its decision "on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Holgate v. Baldwin*, 425 F.3d 671, 675 (9th Cir. 2005); *Marchand v. Mercy Med. Ctr.*, 22 F.3d 933, 936 (9th Cir. 1994).

## ANALYSIS

In resolving this appeal, we must first determine whether Washington or Virginia law applies to this insurance coverage dispute. Only then can we proceed to analyze the coverage issues, including whether Ingenco violated a condition precedent to coverage. We address these questions before turning to the remaining damages and discovery issues.

## A.  Choice of Law

Ingenco is a citizen of Virginia. Ace is a citizen of Pennsylvania. The gas processing plant at issue here is located in Washington, where Ingenco filed suit. The district court engaged in a lengthy choice of law analysis, much of which is unchallenged by the parties. The court properly determined, for example, that Washington's choice of law rules control in this diversity matter. *See Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002). The court also properly determined that an actual conflict exists between Washington and Virginia law. Specifically, the district court observed that under Virginia law, an insured's compliance with a notice provision in an insurance contract is a condition

precedent to coverage even where there is no prejudice to the insurer, while under Washington law, an insurer must demonstrate prejudice. *Compare State Farm Fire & Cas. Co. v. Walton*, 244 Va. 498, 504 (1992) with *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 164 Wash. 2d 411, 424–25 (2008) (en banc); *MacLean Townhomes, LLC v. Am. States Ins. Co.*, 138 Wash. App. 186, 190 (2007). The district court also noted that Washington provides statutory remedies and bad faith causes of action in tort, even absent insurance coverage, while Virginia provides only contract remedies for bad faith claims. *Compare Hanson v. State Farm Mut. Auto. Ins. Co.*, 261 F. Supp. 3d 1110, 1116 (W.D. Wash. 2017), *Absher Const. Co. v. N. Pac. Ins. Co.*, 861 F. Supp. 2d 1236, 1243 (W.D. Wash. 2012) and *James E. Torina Fine Homes, Inc. v. Mut. of Enumclaw Ins. Co.*, 118 Wash. App. 12, 20, 74 P.3d 648, 652 (2003) with *Ryder Truck Rental, Inc. v. UTF Carriers, Inc.*, 790 F. Supp. 637, 639 (W.D. Va. 1992), *Brenner v. Lawyers Title Ins. Corp.*, 240 Va. 185, 193 (1990). The district court also correctly determined that Washington looks to Section 188 of the Restatement (Second) of Conflict of Laws to resolve contract choice of law questions involving multiple-risk policies and looks to Section 145 of the Restatement for tort issues. *See Milgard Mfg., Inc. v. Illinois Union Ins. Co.*, No. C10-5943 RJB, 2011 WL 3298912, at *5–8 (W.D. Wash. Aug. 1, 2011). The parties do not dispute these conclusions.[2]

The parties do dispute, however, whether the district court correctly concluded that Washington law applies. The Restatement provides that the local law of the state with the

---

[2] Ingenco did argue to the district court that Section 193 of the Restatement should control, rather than Section 188. Ingenco does not repeat that assertion on appeal. *See Milgard*, 2011 WL 3298912 at *5–6.

"most significant relationship to the transaction and parties" should control, and that the most significant relationship can be determined by reference to five factors: (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the "location of the subject matter of the contract[;]" and (5) the residence, place of incorporation, and place of business of the parties.  Restatement (Second) of Conflict of Laws §P 188(2) (1971).  Notably, the Restatement further provides that "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue."  *Id.*

### 1.  *The place of contracting*

The Restatement defines "the place of contracting" as "the place where occurred the last act necessary . . . to give the contract binding effect . . . ." Rest. (Second)  Conflict of Laws § 188, cmt. e; *see, e.g.*, *First Commerce, LLC v. Sheldon*, No. 213 CV 01915 RFB GWF, 2016 WL 5791542, at \*2 (D. Nev. Sept. 29, 2016).  The parties dispute whether the insurance contract, or at least the addition of the Washington gas processing plant (the "Cedar Hills facility") to an existing insurance policy, was entered into in Washington or Virginia.  Both sides, however, conflate the "place of contracting" factor with the "place of negotiation" factor.  Indeed, all of the parties' citations to the record appear to pertain more to negotiation of the insurance contract than to its execution.  Given that Ingenco's risk manager, Raymond Yerly, and Ace's managing agent, Tim Drag, met in Virginia and were both located in Virginia, it seems likely that the contract was executed in Virginia.  In any event, however, "standing alone, the place of contracting is a relatively insignificant contact."  Rest. (Second) Conflict of Laws § 188, cmt. e.

## 2. *The place of negotiation*

The record is also somewhat unclear with respect to the place of negotiation. Yerly and Drag did have in-person meetings in Virginia. Ingenco's broker, who communicated with Drag, also appears to have been located in Virginia. Drag acknowledged, however, that prior to the addition of the Washington Cedar Hills facility to the policy, Ace investigated the Washington plant, presumably in person, and that up to fifty percent of Ace's due diligence may have occurred in Washington. Furthermore, some of the negotiations may have occurred by telephone from different states. Neither Yerly nor Drag could recall having a substantive, in-person meeting regarding the Washington facility.[3] Thus, the place of negotiation factor is either neutral, or perhaps weighs slightly in favor of Ace and Virginia. *See* Rest. (Second) Conflict of Laws § 188, cmt. e ("This contact is of less importance when there is no one single place of negotiation and agreement, as . . . when the parties do not meet but rather conduct their negotiations from separate states by mail or telephone.").

## 3. *The place of performance*

With respect to the place of performance, neither party identifies where Ingenco performed, either by paying premiums or otherwise. Ace asserts that its own place of performance was Virginia because the policy states that any loss is to be "adjusted with" and payable to Ingenco, and Ingenco's mailing address is in Virginia. The meaning of the

---

[3] To the extent Yerly referenced discussions regarding finding "a permanent place" for the gas facility, he appears to have meant a proper insurance vehicle rather than a physical, geographical location.

policy's "adjusted with" language is not entirely clear, but suggests that Ace will adjust any claim in collaboration with Ingenco. Ace's managing agent, however, acknowledged that roughly fifty percent of the adjustment of Ingenco's claim took place in Washington, and that the rest took place in New York, not Virginia.

With respect to payment of insurance benefits, some courts have held that the place of performance is the place where payment under a policy would be made. *See, e.g.*, *Pinnacle Realty Mgmt. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. CIVA 06 cv 02063 WDMCB, 2007 WL 1970275, at *3 (D.Colo. July 3, 2007). Other courts applying Section 188 have concluded, however, that "[w]hen the contract is one of payment, the place of performance seems, in truth, of no particular consequence." *State Farm Fire & Cas. Co. v. Miraglia*, No. 4:07-CV-013-A, 2008 WL 11350060, at *3 (N.D. Tex. Jan. 30, 2008) (quoting *Houston Cas. Co. v. Certain Underwriters at Lloyd's London*, 51 F. Supp. 2d 789, 797 (S.D. Tex. 1999). Here, the place of performance factor is neutral, as payment took place in Virginia but adjustment took place in Washington. In any event, this factor merits little weight.

### 4.   *The location of the subject matter of the contract*

Ace argues that the location of the subject matter of the contract "mostly covers Virginia property." This argument depends entirely on the fact that the policy at issue here covers thirteen locations in Virginia and only one in Washington. That emphasis is misplaced, however. The policy in question covers eighteen separate facilities across five states. Although Virginia is home to the largest number of insured facilities, the coverage amount for the lone

Washington facility dwarfs the combined coverage amounts of all seventeen other facilities, let alone the amounts of the thirteen Virginia facilities. The Cedar Hills facility is insured for $35 million in property losses and $12 million in business interruption losses, while the other seventeen facilities are insured for a total of approximately $31.3 million.[4]  Thus, it cannot be said that the policy covers "mostly" Virginia property.

Furthermore, to the extent Ace argues that Section 188 factors look to a jurisdiction's relationship with a contract, rather than with a specific property, Ace cites no authority, and ignores the language of Section 188 itself, which states that contacts "are to be evaluated according to their relative importance *with respect to the particular issue*." Rest. (Second)  Conflict of Laws § 188(2) (emphasis added); *see also Hartford Underwriters Ins. Co. v. Found. Health Servs. Inc.*, 524 F.3d 588, 595 (5th Cir. 2008); *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 234 (3d Cir. 2007) .  The commentary to the Restatement also counsels:

> When the contract deals with a specific physical thing . . .the location of the thing or of the risk is significant (see §§ 189–193). The state where the thing or the risk is located will have a natural interest in transactions affecting it. Also the parties will regard the location of the thing or of the risk as

---

[4] The Cedar Hills facility in Washington appears to be the only facility with business interruption coverage.  Even excluding the business interruption coverage, the Cedar Hills facility is insured against a greater amount of property damage than all of the other seventeen facilities combined.

> important. Indeed, when the thing or the risk is the principal subject of the contract, it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the thing or risk was located would be applied to determine many of the issues arising under the contract.

Rest. (Second) Conflict of Laws § 188, cmt. e.

Thus, in light of the particular issue here and the fact that the Washington facility is, by insured value, far and away the primary subject matter of the policy, the location of the subject matter factor weighs heavily in favor of Washington, and is significant.

### 5. *The residence, place of incorporation, and place of business of the parties*

With respect to residence, place of incorporation, and place of business, only the latter appears to be relevant. It is undisputed that Ingenco's principal place of business is in Virginia. Ingenco represented to the district court both that its subsidiary, Bio Energy (Washington), LLC, has a principal place of business in Virginia and that its offices, records, and personnel are located in Washington. Ingenco, however, is the named insured. This factor weighs in favor of Virginia law, but is not particularly significant. *See* Rest. (Second) Conflict of Laws § 188, cmt. e ("The fact that one of the parties is domiciled or does business in a particular state assumes greater importance when combined with other contacts, such as that this state is the place of contracting or

of performance or the place where the other party to the contract is domiciled or does business.").

### 6.   *The balance of the Restatement factors weighs in favor of the application of Washington law*

Looking, then, to the totality of the relevant Section 188 factors, only the fifth weighs significantly and unequivocally in favor of Ace and the application of Virginia law.  The first, second, and third factors (place of contracting, place of negotiation, and place of performance, respectively) are either neutral or, to the extent they weigh in favor of Virginia law, are not particularly important.  *See* Rest. (Second) Conflict of Laws § 188(2) ("These contacts are to be evaluated according to their relative importance with respect to the particular issue.").  The fourth factor, the location of the subject matter of the contract, weighs heavily in favor of Washington law, and with respect to the particular issue here, is by far the most important factor.[5]  Accordingly, Washington law applies.

## B.  Whether Ingenco's Failure to Notify Violated a Condition Precedent to Coverage

Having concluded that Washington law applies to this insurance coverage dispute, we now turn to the particular coverage provisions and exclusions at issue.

---

[5] The district court looked beyond the Section 188 factors to Washington's interest in protecting its insureds and maintaining the health and safety of its residents.  Although not strictly relevant to a Section 188 analysis, these factors, insofar as they relate to the "particular issue" of damage to a potentially hazardous facility, may be more properly considered as relevant to the "relative importance" attributable to the Section 188 factors, particularly the fourth, "location of the subject matter" factor.  Rest. (Second) Conflict of Laws § 188(2).

It is undisputed that although the diffuser basket straps failed on October 1, 2010 and the entire facility was shut down between October 5 and October 13, Ingenco did not notify Ace of the October diffuser shield malfunction and the resulting loss of beads in V32 until May 11, 2011, when the plant shut down for the second time.  Ace argues that Ingenco's failure to give notice of the initial failure and shutdown violated a condition precedent to coverage under the all risks policy.

As stated above, under Washington law, an insurer contending that an insured violated a condition precedent to coverage, such as by failing to comply with a notice provision, must demonstrate prejudice from the insured's failure. *Mut. of Enumclaw*, 164 Wash. 2d. at 424–25; *MacLean Townhomes*, 138 Wash. App. at 190.  Ace contends that the uncontroverted evidence demonstrates that it was prejudiced by Ingenco's failure to notify Ace of the October 1 diffuser basket failure or the October 5 shutdown. Specifically, Ace points to undisputed evidence that Ingenco discovered the shield failure on October 5, 2010, shut down the facility until October 13, discovered dust throughout the pressure vessels, and replaced all four vessels' diffuser baskets, all without notifying Ace until after the second total shutdown on March 11.[6]

Although Ingenco does not dispute this evidence, it does argue that the evidence is insufficient to demonstrate any

---

[6] Ingenco also admits that it replaced V32's adsorbent beads, but claims that it did not notify Ace because the bead manufacturer did not charge Ingenco for the replacement beads, and therefore Ingenco suffered no loss.

prejudice to Ace.[7]  Indeed, Ace's entire argument is premised on the assertion that Ingenco's remedial actions "depriv[ed] Ace of the ability to reconstruct the system and fully investigate Ingenco's claims about how the failure occurred and why it fell within the Policy's coverage terms."  Ace's argument, however, conflicts with the testimony of its own expert, Dr. Michael Casey.  Dr. Casey testified at his deposition that he was able to determine the cause of the diffuser basket failure based on photographs of the failed basket and straps.  To the extent Dr. Casey testified that Ace was able to evaluate the gas purification system from photographs alone, there is at least a triable issue of fact as to whether Ace was prejudiced by Ingenco's remedial actions.

## C. Whether Ingenco's Losses Resulted From an "External Cause"

### 1.  Background

Ingenco's all risks policy, issued by Ace, insured against "all risks of direct physical loss or damage occurring . . . from any external cause."  Ingenco asserts, somewhat inconsistently, that "gas flow-induced vibrations," the "pressure from the process gas," and the "undiffused, high velocity landfill gas" were "external" causes of Ingenco's adsorbent bead losses.  Ace argues that, as the district court concluded, the unmediated stream of landfill gas that destroyed V32's adsorbent beads does not qualify as an "external" force, and that Ingenco's losses are therefore not covered by the all risks policy.

---

[7] Ingenco did not appeal the district court's conclusion that Ingenco failed to comply with the policy's  notice provision.

There is no dispute about the generally applicable principles of insurance policy interpretation. Policies should be construed as a whole and given the type of sensible construction that an average insurance purchaser would give. *Kitsap Cty. v. Allstate Ins. Co.*, 136 Wash. 2d 567, 575 (1998). Undefined terms must be given their "plain, ordinary, and popular meaning," and any ambiguities should be construed against the insurer. *Id.* at 576.

The policy does not define the term "external cause." Ingenco argues, briefly, that under the plain and ordinary meaning of "external," landfill gas that originated outside the Ingenco facility was, by definition, not internal to the covered facility and, thus, qualifies as an "external" force. Although that argument has some appeal, Ingenco also contends, without explaining why any meaning other than the plain meaning should apply, that, in the absence of a definition of "external cause" in the policy, courts may look to judicial interpretations of that phrase, including the district court's decision in *Standard Structural Steel Co. v. Bethlehem Steel Corp.*, 597 F. Supp. 164, 193 (D. Conn. 1984).[8] Both parties cite the *Standard Structural Steel* court's explanation that, in the context of an all risks policy such as that at issue here, "a

---

[8] In some cases, conflicting dictionary and industry (or judicially-crafted) meanings may create ambiguities that can only be resolved, if at all, through extrinsic evidence. *See Queen City Farms, Inc. v. Cent. Nat. Ins. Co. of Omaha*, 126 Wash. 2d 50, 83 (1994). Here, although Ingenco argues both that the plain meaning of "external cause" should apply and that the *Standard Structural Steel*-type definition applies, Ingenco does not contend that there is any ambiguity in the term "external cause." *See also Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co.*, 132 F.3d 526, 530 (9th Cir. 1997) (looking to other provisions of insurance contract to determine that parties intended industry usage, rather than the plain meaning, of a term).

cause is external if damage which arises from it does not result wholly from an inherent defect in the subject matter or from the inherent deficient qualities, nature and properties of the subject matter."[9] *Standard Structural Steel*, 597 F. Supp. at 193 (internal quotation marks omitted). Other courts, including the district court here, have applied essentially this same definition of "external cause." *See, e.g.*, *Delta Nat. Gas Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, No. CIV.A. 11-57-KSF, 2011 WL 2007706, at \*2 (E.D. Ky. May 23, 2011).

### 2. *Fortuity*

The parties hew closely to the *Standard Structural Steel* definition of external cause and argue at length about whether the V32 diffuser basket and the adsorbent media were "inherently defective." The parties' arguments largely ignore, however, the concept of "fortuity," which operates "as a sort of partnership" with the external cause requirement.[10] *Standard Structural Steel*, 597 F. Supp. at 191–92; *see also*

---

[9] The *Standard Structural Steel* court also stated that all risks insurance policies implicitly require an external cause, even if the language of the policy is not so limited. *Standard Structural Steel*, 597 F. Supp. at 192. Thus, as the *Standard Structural Steel* court explained, "[t]he label 'all risk' is essentially a misnomer. All risk policies are not 'all loss' policies; all risk policies . . . contain express written exclusions and implied exceptions which have been developed by the courts over the years." *Standard Structural Steel*, 597 F. Supp. at 192 (internal quotation and citation omitted).

[10] Ingenco does refer to fortuity in passing in its opening brief and somewhat more extensively in its reply but, at least in part, does so in reference to flow-induced vibrations rather than the stream of incoming landfill gas. Ace does not refer to fortuity at all, but raises arguments that fit within the fortuity framework.

*Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996) (citing "the generally accepted principle that every 'all risk' contract of insurance contains an unnamed exclusion—the loss must be fortuitous in nature." (internal quotation omitted)); *Underwriters Subscribing to Lloyd's Ins. Cert. No. 80520 v. Magi, Inc.*, 790 F. Supp. 1043, 1046 (E.D. Wash. 1991) ("Regardless of its express terms, every all-risk policy contains an unnamed exclusion—the loss must be fortuitous in nature." (internal quotation and citation omitted)).   Indeed, some courts have used the word "fortuitous" as an alternative to "external cause." *See*, *e.g.*, *Dow Chem. Co. v. Royal Indem. Co.*, 635 F.2d 379, 386, (5th Cir. 1981) (stating, in reference to an all risks policy using the term "external cause," that "recovery under an all-risk policy will be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage.").**[11]**

The Washington Supreme Court has not addressed the concept of fortuity as it relates to all risks insurance policies. It is our task, therefore, to predict how the Washington Supreme Court would decide the issue. *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir. 1986).  In so doing, we may look to other courts' decisions for guidance, as well as to treatises, restatements, and other data. *Id.*; *Astaire v. Best Film & Video Corp.*, 116 F.3d 1297, 1300 (9th Cir. 1997), amended, 136 F.3d 1208 (9th Cir. 1998).

---

**[11]** As discussed below, other courts have emphasized the centrality of fortuity over externality in the modern view of all risks policies, holding that because the critical factor is the role of chance, external causation cannot be read into all risks policies, and that even intrinsically caused fortuitous events may be covered under an all risks policy. *See City of Burlington v. Indem. Ins. Co. of N. Am.*, 332 F.3d 38, 48 at n.9 (2d Cir. 2003) (collecting cases).

Courts, often drawing upon the Restatement of Contracts, have typically defined a fortuitous event as one that is dependent upon chance, taking into account the knowledge of the parties.[12] *See, e.g.*, *Compagnie des Bauxites de Guinee v. Ins. Co. of N. Am.*, 724 F.2d 369, 372 (3d Cir. 1983); *Magi, Inc.*, 790 F. Supp. at 1047–48 (collecting cases). Courts have further concluded that a fortuity inquiry should look to, among other things, whether a particular loss was certain to occur, the parties' perception of risk at the time the policy issued, and whether the loss could reasonably have been foreseen.[13] *Magi, Inc.*, 790 F. Supp. at 1048; *Churchill v. Factory Mut. Ins. Co.*, 234 F. Supp. 2d 1182, 1188 (W.D. Wash. 2002); *Frank Coluccio Const. Co. v. King Cty.*, 136 Wash. App. 751, 768 (2007). We conclude that the Washington Supreme Court would adopt a definition of fortuity consistent with this trend.[14]

With this concept of fortuity in mind, we turn to the facts of this case. Here, the fortuity analysis is complicated somewhat by Ingenco's inconsistent references to both "flow

---

[12] According the Restatement of Contracts, "[a] fortuitous event . . . is an event which[,] so far as the parties to the contract are aware, is dependent on chance. It may be beyond the power of any human being to bring the event to pass; it may be within the control of third persons; it may even be a past event, as the loss of a vessel, provided that the fact is unknown to the parties. The event may be positive or negative—an occurrence or a failure to occur." Restatement (First) of Contracts § 291 (1932).

[13] The *Magi, Inc.* court determined that the Washington Supreme Court would adopt a similar definition. *Magi, Inc.*, 790 F.Supp. at 1048.

[14] Multiple district courts within this circuit have made similar predictions. *See, e.g.*, *Magi, Inc.*, 790 F.Supp. at 104; *Kilroy Indus. v. United Pac. Ins. Co.*, 608 F. Supp. 847, 858 (C.D. Cal. 1985).

induced vibrations" and "the process gas" as the cause of its losses, as discussed above.  Were the inquiry focused on the fortuity of "the process gas," Ingenco could not possibly succeed, as it is undisputed that all parties fully expected the stream of landfill gas to enter the Cedar Hills facility and, as Ingenco concedes, the incoming stream of gas never exceeded expected tolerances.  The focus of our fortuity analysis, however, is not on the fortuity of the process gas or some other cause, but rather on whether Ingenco's *loss* was fortuitous.  There is no evidence in the record that the failure of the diffuser basket cover plate straps,  or the subsequent obliteration of the adsorbent media, was inevitable.  Nor is there any evidence in the record that either party had reason to believe, at the time the policy issued, that the diffuser basket cover would fail under normal gas pressures, or that the adsorbent media would ever be exposed to an unmediated stream of high pressure gas.  Lastly, Ingenco's expert opined that the resonant vibrations in the metal straps were not, and could not have been, reasonably foreseen.  *See Magi, Inc.*, 790 F. Supp. at 1047–48; *see also City of Burlington v. Indem. Ins. Co. of N. Am.*, 332 F.3d 38, 49  (2d Cir. 2003) (recounting Third Circuit's conclusion in *Compagnie Des Bauxites* that "while in hindsight [] structural defects might appear inevitable, [the court] had to credit the insured's statements that it had no knowledge of the design defects and that the loss was therefore fortuitous," and explaining that "an intrinsically caused loss may be just as unexpected as an extrinsically caused one.").  Thus, it appears that Ingenco's loss was indeed fortuitous, or that there is, at the very least, a triable issue of fact regarding the issue.

### 3.  External Cause

A determination that a particular loss is fortuitous could obviate the need to examine whether that loss was caused by an external force.  Although the policy language here undoubtedly applies only to losses resulting from an "external cause," some courts, interpreting nearly identical policy language, have held that an insured need *only* demonstrate that a fortuitous loss has occurred, notwithstanding "external cause" policy language.  *See*, *e.g.*, *Atl. Lines Ltd. v. Am. Motorists Ins. Co.*, 547 F.2d 11, 12 (2d Cir. 1976).  The Fifth Circuit addressed one such situation, explaining:

> As has been recognized in other circuits, it would appear that all risks insurance arose for the very purpose of protecting the insured in those cases where  difficulties of logical explanation or some mystery surround the (loss of or damage to) property.  It would seem to be inconsistent with the broad protective purposes of "all risks" insurance to impose on the insured . . . the burden of proving the precise cause of the loss or damage.  It is not surprising, therefore, that courts which have considered claims under insurance policies with essentially the same insuring language as the policy before us have consistently refused to require the insured to demonstrate that the loss or damage was occasioned by an external cause.  We similarly refuse to impose such a burden in this case.

*Morrison Grain Co. v. Utica Mut. Ins. Co.*, 632 F.2d 424, 430 (5th Cir. 1980).

Although we find this reasoning persuasive, the Washington Supreme Court has not spoken on the issue. We need not predict, however, whether the Washington Supreme Court would read "external cause" policy language to require an insured to make a separate showing of external causation. Even assuming that the Washington Supreme Court would, unlike the *Morrison Grain* court, require an insured to show not only a fortuitous loss, but also an "external cause" in the all risks context, and would adopt the *Standard Structural Steel* definition of "external cause" as dependent on whether resulting damage arises "wholly from an inherent defect in the subject matter," there nevertheless remains a triable issue of fact here.[15]  *Standard Structural Steel*, 597 F. Supp. at 191.

As an initial matter, the district court appears to have conflated, or at the very least applied, two different definitions of "external cause."  To the extent that the district court concluded that "the incoming landfill gas was necessary and internal to the gas purification system," it appears to have applied a plain and ordinary meaning of "external."  Whether it did so correctly is debatable.  On the one hand, landfill gas was certainly essential to the *operation* of the Cedar Hills facility.  At the same time, however, landfill gas was not an

---

[15] Although we refrain from concluding that the Washington Supreme Court would follow a *Morrison Grain*-like approach, neither do we suggest that the court would adopt the *Standard Structural Steel* court's view of external causation.  To the contrary, although the Washington Supreme Court  has not addressed the precise issue, it has, in the all risks context, suggested that an external cause can exist even in circumstances involving latent defects. *See  Dickson v. U.S. Fid. & Guar. Co.*, 77 Wash. 2d 785, 793–94 (1970).

essential component of the facility or of the machinery itself, which existed before the first inflow of gas was ever piped in.[16]  Furthermore, although the landfill gas indisputably "arose" from outside the insured facility, whether it "acted" internally or externally depends on whether the borders of the insured subject matter begin at the property line or at the edge of the pressure vessel.[17]  These conflicts are difficult to resolve on the record before us, and perhaps, more than anything, illustrate the advantages of avoiding the "external cause" question altogether. *See Morrison Grain*, 632 F.2d at 430.

The district court also, however, applied the *Standard Structural Steel* definition of "external cause," concluding that because there was an inherent problem in the gas purification system, "the landfill gas was not an external cause." *See Standard Structural Steel*, 597 F. Supp. at 193. The district court based that conclusion on its determination that because the purification system, and in particular the diffuser basket, was (1) designed to withstand landfill gas and (2) failed to do so, it must have suffered from an inherent defect. This logic, which Ace essentially reiterates on appeal, is difficult to square, particularly in the all

---

[16] Indeed, King County, which controls the Cedar Hills landfill, has the ability to completely shut down the inflow of gas.

[17] Ingenco's argument that the object of the insurance *claim*, which in this case is limited to the diffuser beads, defines the physical borders relevant to an externality inquiry is not persuasive.  Although Ingenco argues that Ace's characterization of the subject matter of the policy is so comprehensive as to render any damage "internal," Ingenco's characterization is no less extreme, being so fine-grained as to render virtually any damage to any particular component, such as adsorbent beads, "external."

risks context.  Although, in general, system failures of any kind can conceivably result from an inherent defect, so too might failures occur for some other, justifiably unexpected reason.  *See*, *e.g.*,  *City of Burlington*, 332 F.3d at 49 ("[I]n hindsight[, ] structural defects might appear inevitable, . . . [but] an intrinsically caused loss may be just as unexpected as an extrinsically caused one."); *Morrison Grain*, 632 F.2d at 430 ("[A]ll risks insurance arose for the very purpose of protecting the insured in those cases where  difficulties of logical explanation or some mystery surround the (loss of or damage to) property.").

Even putting that logic aside, the district court's conclusion that an inherent defect, and therefore an internal cause, was responsible for Ingenco's losses fails to account for material evidence and, indeed, is inconsistent with the district court's own determinations.  The district court stated that the V32 diffuser basket was "not necessarily defective," and acknowledged that Ingenco presented "some evidence that the [diffuser] basket may not have been defectively designed."  This observation is impossible to reconcile with the district court's conclusion on summary judgment that an inherent defect nevertheless existed.  Ingenco's expert opined not only that resonant vibrations caused the V32 shield failure, but also that such failure was rare, that the vibrations were unforeseeable and, perhaps for that reason, that the relevant design codes do not require testing for resonant vibrations.  Although Ace's experts certainly disagree, that genuine dispute of fact is material to the questions whether (1) the gas purification system, or V32's diffuser basket and its adsorbent beads, did, in fact, suffer from an inherent defect and (2) accordingly, whether the cause of Ingenco's loss was internal or external.

We therefore conclude that the district court's grant of summary judgment to Ace on the question of whether Ingenco's loss was the result of an "external cause" must be reversed.  The district court, and to some extent, the parties, failed to consider the role of fortuity in all risks insurance disputes.  There is, at least, a dispute of fact as to whether Ingenco's loss here was fortuitous.  We take no position at this juncture on the question whether the Washington Supreme Court would require a separate showing of external causation.  Even assuming, however, that Ingenco must make such a showing, and even assuming that "external cause" is coterminous with "inherent defect," there is a triable issue of fact as to whether Ingenco's purification system, and/or its components, suffered from such a flaw.

## D.  The Ensuing Loss Exception

Ingenco's all risks policy excluded losses resulting from "[f]aulty or defective material, faulty workmanship, faulty methods of construction, [or] errors or omissions in plan or specification or designs . . . unless loss by a peril not otherwise excluded ensues . . . ."  Ingenco argues that, even if V32's diffuser basket was defectively designed, and even if its failure therefore constitutes an uncovered "internal" cause of loss, the "ensuing loss" exception quoted above preserves coverage for the post-failure damage to the adsorbent beads throughout the purification system.  Ace's opposition is based largely upon the contention, discussed at length above, that the damage at issue here did not result from an "external cause."

As Ingenco points out, the Washington Supreme Court discussed ensuing loss exclusions in *Vision One, LLC v. Philadelphia Indem. Ins. Co.*, 174 Wash. 2d 501 (2012).  As

the *Vision One* court explained, ensuing loss clauses ensure that, where an uncovered event takes place, any ensuing loss which is otherwise covered by the policy remains covered, even though the uncovered event itself is never covered. *Vision One*, 174 Wash.2d at 515. For example, if a homeowner's policy excluded losses from faulty workmanship, an electrician's wiring mistakes would not be covered, even if the policy included an ensuing loss exception. *Id.* If, however, those uncovered wiring mistakes subsequently caused a fire that then caused additional damage, the fire damage would be covered under the ensuing loss clause. *Id.* Conversely, for example, if a policy contained an ensuing loss provision but specifically excluded both faulty construction and mold losses, the ensuing loss provision would not preserve coverage where defective construction led to mold damage, because the ensuing mold damage was not "otherwise covered." *Id.* "[T]he dispositive question in analyzing ensuing loss clauses is whether the loss that ensues from the excluded event is covered or excluded. If the ensuing loss is also an excluded peril or an excluded loss under the policy, there is no coverage." *Id.* at 516.

The bulk of the dispute here appears to center on whether Ingenco's bead-related loss ensued from some other, prior, uncovered loss, or itself constituted the loss. Ingenco concedes that the loss of the V32 diffuser shield was not covered.[18] Ingenco argues, however, that because the destruction of the adsorbent beads occurred subsequent to the shield failure, the ensuing loss provision should operate to

---

[18] It is not entirely clear whether Ingenco's concession is based upon the fact that the basket failed for some excluded reason, the fact that the basket was not an integral part of the nitrogen rejection vessel, or some other reason.

cover the bead-related loss, regardless of the fact that the shield failure itself is excluded. In response, Ace argues that "nobody is concerned with damage to the diffuser basket itself," and thus the bead-related damage is not an *ensuing* loss, but rather the excluded loss itself.

Ace's argument appears to be inconsistent with its prior assertion that the high-pressure stream of landfill gas was the internal cause of Ingenco's loss. *Vision One* counsels that the key question is whether "the loss that ensues *from the excluded event* is covered or excluded." *Vision One*, 174 Wash.2d at 516 (emphasis added). Ace's understanding of "the excluded event" is difficult to pin down. In the external cause context, Ace argues that the stream of landfill gas was an internal, causative event, and was thus excluded. In the ensuing loss context, in contrast, Ace appears to suggest a different precipitating "excluded event," suggesting that the breakdown of the adsorbent beads is the primary event. At the same time, however, Ace also states that the loss of the beads was "caused by the diffuser basket's defective design," suggesting yet a third potential preliminary, excluded cause. Ace cannot have it both (or all three) ways.

Proceeding, therefore, with the understanding that the loss of the adsorbent beads did ensue from some prior, but excluded loss or event, whether it be the stream of gas or the failure of the diffuser shield, the question remains whether the loss of the beads was itself excluded. *Vision One*, 174 Wash.2d at 516. In other words, to compare these facts to the examples cited in *Vision One*, is the loss of the beads more akin to the fire damage in the mis-wiring example or to the mold in the defective construction case? We conclude that the answer is the former. Although in the latter example,

the mold did ensue from faulty construction, the ensuing loss provision nevertheless did not preserve coverage because mold itself was an excluded peril. *Id.* Here, there was no specific exclusion regarding the loss of the beads, just as in the mis-wiring example, there was no specific exclusion for fire.[19] Thus, even if it were conclusively established that the diffuser shield suffered from some inherent defect, the subsequent destruction of the adsorbent beads would be covered under the policy's ensuing loss exception.

### E.  The Endorsement's "Accident" coverage

Ingenco also argues that the separate Boiler and Machinery endorsement to the policy independently confers coverage for Ingenco's losses. The Endorsement covered "Accident[s]," defined as a "sudden and accidental breakdown of an Object," exclusive of "depletion, deterioration, . . . [and] wear and tear . . . ." As discussed above, Ingenco's experts opined that the "truly sudden" breakdown of V32's diffuser shield, which resulted in the destruction of the adsorbent beads in V32 and throughout the system, was the "unexpected"  result of unanticipated resonant vibrations that were "not foreseeable." Thus there is a genuine dispute of material fact as to whether the Endorsement applies.

### F.  Actual Time of Repair

Assuming, for the sake of argument, that there is coverage, the policy covers business interruption losses for

---

[19] To the extent Ace argues that there was such an exclusion because the beads themselves suffered from an inherent defect, there is a triable issue of fact regarding the integrity of the beads.

"only such length of time . . . as would be required with the exercise of due diligence and dispatch to rebuild or replace" damaged property.  Ingenco did not resume operations at Cedar Hills for approximately sixteen months after the second, March 2011 shutdown.  Nor did Ingenco perform any remedial work at the facility for approximately nine months, during which time Ingenco evaluated alternative options for nitrogen removal.  Nevertheless, Ingenco seeks to recover for the entire sixteen-month shutdown period.  Ace argues that Ingenco's business interruption recovery should be limited to the "theoretical period of restoration."  The district court largely agreed with Ace, concluding that the applicable period "is limited to the hypothetical period of restoration."

Some courts have held that the applicable period for an insured to reenter business is the "theoretical replacement time." *Vermont Mut. Ins. Co. v. Petit*, 613 F. Supp. 2d 154, 161 (D. Mass. 2009); *W. & Clay, LLC v. Landmark Am. Ins. Co.*, No. C09-1423 MJP, 2011 WL 321740, at *5 (W.D. Wash. Jan. 28, 2011); *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, No. 01 CIV.9291(MBM), 2005 WL 827074, at *9 (S.D.N.Y. Feb. 15, 2005).  Nevertheless, Ingenco argues, based largely upon our memorandum disposition in *Alevy v. All. Gen. Ins. Co.*, No. 95-56034, 1996 WL 623065 (9th Cir. Oct. 24, 1996), that the "actual replacement time" is relevant to the measure of Ingenco's losses.[20]  The *Alevy* court observed that although theoretical replacement time would be an appropriate measure of actual insured losses where payment was to be made before rebuilding was complete, actual replacement time is a more logical "starting point in the analysis" where rebuilding has

---

[20] Ingenco's citation to the unpublished disposition in *Alevy* runs counter to Ninth Circuit Rule 36-3.  *See* CTA9 Rule 36-3(a), (c).

already occurred. *Alevy*, 1996 WL 623065, at \*2–3; *see also SR Int'l*, 2005 WL 827074, at \*7. Other courts have agreed that it makes "perfect sense" to look first to actual time of repair in cases where businesses have completed repairs or resumed operations by the time a court is presented with the task of interpreting coverage provisions. *See*, *e.g. SR Int'l*, 2005 WL 827074, at \*7.

Here, as in *Alevy*, repairs had already been made by the time Ace denied Ingenco's claim. We conclude that under such circumstances, the actual time of repair has some bearing on what period "would be required with the exercise of due diligence and dispatch to rebuild or replace" damaged property. We further observe, however, that Ingenco does not argue, nor does any authority appear to state, that the applicable repair period should be measured by "actual replacement time" even where the actual time to repair is unreasonable.[21] Thus, although Ingenco's actual time to repair might be relevant to the question whether a sixteen-month shutdown was consistent with "the exercise of due diligence and dispatch," it is by no means dispositive.

---

[21] Furthermore, to the extent Ingenco seeks to recover amounts beyond the theoretical replacement time because of Ace's alleged delay in investigating and adjusting Ingenco's claim, we note that even those courts that have applied theoretical replacement time as the measure of loss have provided for extensions of that time to account for an insurer's delay. *See*, *e.g.*, *Vermont Mutual*, 613 F. Supp. 2d 154 at 161 ("The period of restoration is a 'theoretical replacement time,' which a court may extend to account for an insurer's failure to adjust [a] loss within a reasonable time." (internal quotation and citations omitted)).

## G. Sanctions

The district court determined that Ingenco willfully withheld evidence of damages on its state law statutory claims. The district court then, as a sanction, precluded Ingenco from introducing such evidence.**[22]** *See* Fed. R. Civ. P. 37(c). Ingenco argues that the district court abused its discretion in finding willful misconduct because (1) Ingenco responded to Ace's request for damages information within one day of Ace's request, and (2) the district court refused to consider sanctions other than dismissal.

We afford district courts "particularly wide latitude" to impose discovery sanctions, and will not reverse absent a "definite and firm conviction that the district court committed a clear error of judgment." *R&R Sails*, 673 F.3d at 1245; *Marchand*, 22 F.3d at 936. The district court observed that Ace requested damages information in written interrogatories several months before Ingenco ultimately, after an additional request from Ace, provided the information at a Rule 30(b)(6) deposition. Furthermore, Ace points out, as did the district court, that Federal Rule of Civil Procedure 26(a)(1)(A)(iii) requires the disclosure of "a computation of each category of damages claimed by the disclosing party—who must also make available . . . the documents or other evidentiary material . . . on which each computation is based, including materials bearing on the nature and extent of injuries suffered," regardless whether the opposing party requests such information. Fed. R. Civ. P. 26(a)(1)(A)(iii). The

---

**[22]** Because damages are an essential element of the statutory claims, the district court then dismissed the claims. Ingenco does not appear to dispute that, to the extent the exclusion of Ingenco's damages evidence was proper, dismissal of the statutory claims was also appropriate.

district court concluded that Ingenco's initial disclosures, which were never supplemented, never disclosed any damages information related to statutory claims.  Here, on appeal, Ingenco has not presented any argument explaining this failure to meet its affirmative obligations under Rule 26.

When a party fails to disclose information required by Rule 26, Rule 37(c)(1) provides that the improperly withheld information should be excluded, unless the failure to disclose is "substantially justified or harmless."  Fed. R. Civ. P. 37(c)(1).  Here, the district found that Ingenco's eleventh hour disclosure was not substantially justified, and was not harmless because it disrupted both Ace's and the court's schedules.  Although the court's prejudice explanation was not particularly detailed, its conclusion was not clearly erroneous.

The district court also recognized that, because exclusion of Ingenco's statutory damages evidence as a Rule 37(c) sanction would be dispositive of Ingenco's statutory claims, which require a showing of damages, the court was required to consider (1) whether Ingenco's noncompliance involved willfulness, fault, or bad faith, and (2) whether lesser sanctions were available.  *See R&R Sails*, 673 F.3d at 1247. The district court made the required findings of willfulness, fault, and bad faith, supported by evidence that Ingenco (1) ignored Ace's written interrogatories, (2) never complied with its Rule 26 obligations, or even attempted to do so until one day before the discovery cutoff, and then (3) attempted to blame Ace for those failures instead of justifying or explaining them.  The district court also explained that a lesser sanction would not be appropriate because (1) Ingenco had not put forth any viable alternative and (2) any lesser

sanction requiring the reopening of discovery would have interfered with the impending trial date.

Accordingly, the district court did not abuse its discretion in sanctioning Ingenco for failure to disclose statutory damages information to Ace, even though those sanctions resulted in the dismissal of Ingenco's statutory claims.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's orders in part, insofar as they apply Washington law and exclude evidence of damages for purposes of state law claims as a discovery sanction. We **REVERSE**, however, the district court's grant of summary judgment against Ingenco and **REMAND** to the district court for trial. Each party shall bear its own costs.

**AFFIRMED IN PART; REVERSED IN PART; and REMANDED.**